**Ramon Torres HERNANDEZ,**
**Petitioner,**

v.

**Rick THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

**Civil No. SA–08–CA–827–OG.**

United States District Court,
W.D. Texas,
San Antonio Division.

May 13, 2011.

Robin R. Norris, Jr., Attorney at Law, El Paso, TX, for Petitioner.

Tomee Morgan Heining, Office of the Attorney General, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

ORLANDO L. GARCIA, District Judge.

Petitioner Ramon Torres Hernandez filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his October, 2002 Bexar County conviction for capital murder and sentence of death. For the reasons set forth hereinafter, petitioner is entitled to neither federal habeas relief nor a Certificate of Appealability from this Court.

### I. Background

#### A. The Cold Case

On the evening of December 16, 1994, a pair of middle school girls, cousins Sarah Gonzales and Priscilla Almares, disappeared while walking together not far from Sarah's residence in the Timber Creek area of San Antonio.[1] On December 17, 1994, a group of employees from an auto-

---

1. At petitioner's trial, an acquaintance of Sarah Gonzales testified (1) December 16, 1994 was the last day of school before Christmas break that year, (2) he attended Anson Jones Middle School with Sarah Gonzales, (3) that day, Sarah asked him for his phone number, (4) when he gave her his phone number, Sarah wrote it down on her hand, and (5) he never saw Sarah thereafter. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume 21, testimony of Damon Bailey, at pp. 18–23.

Another of Sarah Gonzales' classmates at Anson Jones Middle School testified (1) she and Sarah were both in the seventh grade in December, 1994, (2) she invited Sarah to attend a Christmas party at her home on the evening of December 16, 1994, (3) Sarah asked her if Sarah could bring her cousin Priscilla to the party, (4) after school that afternoon, she saw Sarah get off the bus at the corner of Meadow Way and Timber Creek, (5) around five or six p.m., she saw Sarah and Priscilla walking down Meadow Way toward the corner of Meadow Way and Marbach, where a Church's fried chicken restaurant was located, (6) she gave Sarah a flyer announcing the Christmas party, (7) neither Sarah nor Priscilla ever arrived at her party, and (8) she never saw either of them thereafter. S.F. Trial, Volume 21, testimony of Julia Miera, at pp. 27–37, 46.

The aunt of both Sarah and Priscilla testified (1) she picked up Priscilla from Peas Middle School on December 16, 1994 and dropped Priscilla off at Sarah's home on Timber Creek, (2) Sarah and Priscilla were close friends in addition to being cousins, (3) after

mobile dealership and their families out delivering Christmas baskets to needy families discovered the lifeless bodies of Sarah and Priscilla lying in the high brush along side a road.[2] The medical examiner testified both girls' bodies showed signs of severe sexual assault and asphyxiation by strangulation, possibly either manual or ligature.[3] Sarah's sexual assault kit revealed no sperm.[4] Priscilla's vaginal slide did not reveal any sperm but her anal slide did show the presence of sperm.[5] DNA testing employing the techniques available in 1995 managed only to exclude two gang members whom law enforcement officers were investigating at that time.[6] The trail of Sarah and Priscilla's killer quickly grew cold until DNA testing performed in 2001 showed petitioner's DNA to be a match for the sperm fraction of Priscilla's anal swab.[7]

### B. *The Disappearance of Rosa Rosado*

On the evening of March 31, 2001, Rosa Maria Rosado disappeared while en route to work.[8]

### C. *The Confession of Asel Abdygapparova*

On April 5, 2011, Asel Abdygapparova met with a San Antonio Police Homicide

---

watching Priscilla enter Sarah's home, she never saw either girl again, and (9) in December, 1994, Priscilla was twelve years old and Sarah was thirteen. S.F. Trial, Volume 21, testimony of Nelda Charles, at pp. 50–63.

2. S.F. Trial, Volume 21, testimony of Robert Allen Strom, II, at pp. 64–68; testimony of Mary Lou Phillips, at pp. 72–76; testimony of Robert Neaves, at pp. 78–81; testimony of Harold Sipple, at pp. 91–94.

The San Antonio Police officer who processed the crime scene testified (1) the girls' bodies were found in the 6500 block of Keitha Road, lying in the grass along the asphalt and gravel shoulder of a roadway in a trashy area not far from a cul-de-sac, (2) one girl was missing a shoe, and (3) it appeared the girls had been brought there from another location and dumped there. S.F. Trial, Volume 21, testimony of Mark Witherell, at pp. 98–124.

3. More specifically, the medical examiner who performed the autopsies on both girls' bodies testified (1) Priscilla was missing one boot and her shirt was pulled up to reveal her bra, (2) both girls had freshly masticated chicken and french fries in their stomachs, (3) both girls' torsos were exposed and showed contusions thereon, (4) both girls showed signs of severe sexual assault, i.e., significant injuries to their vaginal areas consistent with trauma that would have necessitated medical evaluation, including vaginal bruising, injuries to the hymen, and blood in their vaginal vaults, (5) the sexual assaults occurred in both girls while they were alive, (6) Priscilla had tearing of her vaginal walls, (7) both girls died as a result of strangulation, (8) it was not possible to determine the method of strangulation employed to kill either girl, (9) the method used to strangle the girls would have been either manual, an irregular ligature such as a towel, or even the crook of the elbow, and (10) neither of the girls' bodies were very dirty. S.F. Trial, Volume 21, testimony of Steven A, Erickson, at pp. 128–66.

4. S., F. Trial, Volume 21, testimony of Lonnie Ginsburg, at pp. 175–76.

5. *Id.*, at pp. 177, 180, 183, 186–87.

6. A San Antonio Police Sergeant testified police forwarded DNA samples from two gang members murdered after the discovery of the girls' bodies to the Texas DPS Lab in Austin for comparison against the DNA found in Priscilla's anal swab. S.F. Trial, Volume 22, testimony of Martin J. Landgraf, at pp. 17–19.

A Texas Department of Public Safety DNA Supervisor and a former employee of the DPS Lab testified DQ Alpha and D1S80 tests conducted in 1995 excluded each of those two suspects as possible donors of the sperm fraction of the mixed sample found in Priscilla's anal swab. S.F. Trial, Volume 21, testimony of Irma Rios, at pp. 215–31; testimony of Kathleen Zeller, at pp. 244–48.

7. S.F. Trial, Volume 24, testimony of Garon Foster, at pp. 50–54; testimony of Meghan Clement, at pp. 92–94.

8. S.F. Trial, Volume 22, testimony of Patricia Hernandez, at pp. 40–49.

Detective and gave a five-page written statement detailing her knowledge of Rosado's abduction, robbery, sexual assault, and murder by petitioner Ramon Hernandez and Santos Minjarez.[9] On April 6,

9. A copy of Asel Abdygapparova's written statement appears at pages 299–303 of petitioner's State Habeas Transcript.

Asel's statement described Rosado's abduction and robbery by Minjarez and petitioner before petitioner drove them to a hotel, where Abdygapparova rented a room and Minjarez sexually assaulted Rosado multiple times:

> I drove back to the hotel and knocked on the door. It took about ten minutes to get back. The door opened, but I don't know who opened it. I saw Santos and Ramon standing there, and they had their clothes on. I saw the girl on the bed. She was just laying down. She had a top on, but nothing from the waist down. She was still alive, but still had her mouth covered. I went to use the bathroom. While I was in there Ramon walked in. I don't remember if he said anything, but I was asking him what they were going to do. He wouldn't answer. I walked out of the bathroom and I saw Santos. He was raping the girl. He was sitting in a chair and he was holding her in his lap and was raping her. She was facing away from him and her hands were tied. She still had the top on, and she wasn't saying anything because her mouth and face were still covered. Santos still had his boots on. His pants were still on him, but were down by his boots. I knew he was raping her and she didn't want to do that. I don't think she would have done that herself. I felt bad for her because what Santos and Ramon were doing to the girl wasn't right. It was upsetting me very much.
>
> Ramon called me back into the restroom. He said something, but I don't remember what he said. We waited in there, then Santos came in. I walked out of the restroom and sat on a chair. The girl was laying on the bed. She had a blanket from my car covering her. It was a red and blue blanket. She was still alive. Santos or Ramon, I don't remember which one, called me back to the restroom. One of them told me to go buy a shovel. I'm not sure which told me. Then Santos walked out. After he walked out I asked Ramon what they were going to do. Ramon told me to just go get the shovel. When I walked out I saw Santos raping her again. He was standing by the bed, and she was

> still on the bed. She was still alive, on her knees, and facing away from him. I went back into the bathroom, but Ramon was telling me to leave and go get the shovel. I was asking him to go with me because I was scared and didn't know what they were going to do, but he walked me out of the hotel room to the car. As I was walking by I guess Santos finished his thing because he pushed the girl on the bed. I wasn't looking at him, but I could see him pull his pants up through the side of my vision. I would not look at the girl because I was scared. I felt very bad for her because nobody deserves that. She hasn't done anything to them to be treated like that.
>
> I was still asking Ramon to go with me, but he said no, he had to stay there with Santos. I left and went to the Walmart on 410 and Evers. I went in and bought a shovel. It was long with a straight wooden handle and a curved edge for the blade. That was sometime around 11:00pm I think. That time just sticks in my head for some reason.
>
> After I bought the shovel I went back to the motel room. I parked the car and knocked. Santos opened the door. He wouldn't let me in, but walked me back to the car. He was telling me not to go in there. I asked him why, what did they do in there. He said she is gone. I said what do you mean, you killed her? He said "yes, she is gone." He told me to wait outside. I was waiting by the car. Santos came back out and called me to the room. I went into the room and saw her laying down on the floor. She didn't have a towel on her head anymore and she had no clothes on. That is when I saw her body. She was dead. She wasn't moving, and she didn't have the towel on her head or the tape on her wrists. Her eyes were closed, and there was some blood on the right side of her face. I couldn't tell where it was coming from. They told me they have to bury her.

Statement of Asel Abdygapparova, Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), Volume I, at pp. 300–01.

Abdygapparova's statement then detailed how the trio transported Rosado's body to a

2011, Abdygapparova led police to a clearing near the University of Texas at San Antonio campus off 1604 and Chase Hill Boulevard where police found Rosado's body-buried in a shallow grave.[10] Abdygapparova also led police to the motel where she informed police petitioner and Minjarez had held Rosado during her final hours.[11]

## D. Petitioner's Arrest and First Interrogation (April 6, 2001)

San Antonio Police arrested petitioner during the early morning hours of April 6, 2001.[12] From approximately 2:25 to 5:00 a.m. on April 6, 2011, San Antonio Police

Detectives John Kellogg and Andrew Carian interviewed petitioner after giving petitioner his *Miranda* warnings.[13] Initially, petitioner denied knowing either Minjarez or Abdygapparova.[14] Petitioner eventually admitted he knew Minjarez but then asked for an attorney and his interview promptly halted.[15]

## E. Petitioner's Second Interrogation (April 7, 2001).

Around 11:45 a.m. on April 7, 2001, petitioner met with Bexar County Adult Detention Center social worker Kim Robinson and, shortly thereafter, with BCADC intake and release supervisor Rogelio

---

location near the UTSA campus along Loop 1604 and buried her in a shallow grave.

**10.** S.F. Trial, Volume 22, testimony of John Kellogg, at pp. 50–55, 57, 65–67, 75; testimony of Doug Ryan, at pp. 76–84, 93–99; testimony of Katie Allen, at pp. 99–112. S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 29–30.

**11.** S.F. Trial, Volume 22, testimony of John Kellogg, at pp. 56–57; testimony of Harold Bellamy, at pp. 129–33; testimony of Michael Garcia, at pp. 150–54, 157–88. S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 31–32.

The owner of the motel to which Abdygapparova led police testified at trial (1) he rented a room to Abdygapparova on March 31, 2001 at approximately 8:50 p.m., (2) Abdygapparova registered under the name "Asel Lee," (3) he did not see others in the room in question on that night, (4) but when he checked the room later, a bed spread was missing, and (5) police later searched the room in question and removed carpeting and chair cushions. S.F. Trial, Volume 22, testimony of Ansuya Bhagat, at pp. 114–26.

An employee of the WalMart where Abdygapparova purchased the shovel used to bury Rosado's body identified a surveillance video tape recording that appeared to depict Abdygapparova purchasing a shovel at approximately 10:45 p.m. on March 31, 2001. S.F. Trial, Volume 22, testimony of John Hernandez, at pp. 135–44.

**12.** S.F. Trial, Volume 23, testimony of Kenneth Tollett, at pp. 13–15.

During the evidentiary hearing held in October, 2007 in petitioner's state habeas corpus proceeding, both petitioner and his mother testified petitioner was arrested at approximate two a.m. on April 6, 2001. Statement of Facts from State Habeas Hearing (henceforth "S.F. State Habeas Hearing"), Volume 3 of 10, testimony of Ramon Hernandez, at p. 194; testimony of Gloria Torres Hernandez, at p. 304.

**13.** S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 27–38; S.F. State Habeas Hearing, Volume 5 of 10, testimony of John Kellogg, at pp. 50–55; Volume 5 of 10, testimony of Andrew Carian, at pp. 87–95.

Detective Kellogg testified he was not present throughout the entirety of petitioner's April 6, 2011 interview but, rather, was present for approximately 45 minutes beginning shortly after Detective Carian began interviewing petitioner and then for a second, shorter, period before Kellogg left the Police homicide office around 3:30 a.m. S.F. State Habeas Hearing, Volume 5 of 10, testimony of John Kellogg, at pp. 49–55, 70–71.

**14.** S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 27–37; S.F. State Habeas Hearing, Volume 5 of 10, testimony of Andrew Carian, at pp. 88–91, 122–28, 131–32.

**15.** *Id.*

Contreras.[16] Deputy Contreras notified the San Antonio Police Department's homicide office that petitioner wished to speak with detective Carian.[17] Later that same date, detectives Carian and Kellogg met with petitioner at the BCADC and, after again being given his *Miranda* warnings, petitioner agreed to be transported to the San Antonio Police for the purpose of giving a formal written statement.[18] Petitioner thereafter gave a nine-page, written statement which petitioner reviewed and edited very carefully.[19] In his written statement executed April 7, 2001, petitioner stated (1) he and Minjarez decided to rob Rosado when they spotted her near a bus stop, (2) he drove the vehicle during Rosado's abduction, but (3) Minjarez was the person who actually sexually assaulted and murdered Rosado.[20] Petitioner does not claim there was any factually inaccurate information contained in his written statement.[21]

### F. *Indictment*

On March 12, 2003, a Bexar County grand jury indicted petitioner in cause no. 2002–CR–1613 on a single Count of capital murder, alleging four different theories of that offense.[22] More specifically, petitioner was charged with (1) having intentionally and knowingly murdered Rosado while in the course of committing and attempting to commit the predicate felonies of aggravated sexual assault, kidnaping, and robbery upon Rosado and (2) having committed more than one murder (i.e., the murders of Rosa Rosado, Sarah Gonzales, and Priscilla Almares) during different criminal transactions but pursuant to the same scheme and course of conduct.[23]

### G. *Petitioner's Motion to Suppress His Statement*

On March 20, 2002, the state trial court held an evidentiary hearing on petitioner's motion to suppress, as involuntary, his written statement. Petitioner did not testify during the hearing on his motion to suppress.

The social worker with whom petitioner spoke on the morning of April 7, 2001

---

**16.** S.F. Trial, Volume 2, testimony of Kim Robinson, at pp. 4–17; S.F. State Habeas Hearing, Volume 4, of 10, testimony of Rogelio M. Contreras, at pp. 238–53; Volume 5 of 10, testimony of Kim Robinson, at pp. 3–46.

**17.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rogelio M. Contreras, at pp. 240–52; Volume 5 of 10, testimony of Andrew Carian, at pp. 96–97.

**18.** S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 38–44; S.F. State Habeas Hearing, Volume 3, testimony of Ramon Hernandez, at p. 251; Volume 5 of 10, testimony of John Kellogg, at pp. 61–66; testimony of Andrew Carian, at pp. 97–107.

**19.** S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 38–43; Volume 23, testimony of Andrew Carian, at pp. 37–39, 63–64. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 221, 223, 225–26, 230, 233–34, 251, 287–88.

Petitioner's nine-page written statement was admitted into evidence during petitioner's trial as State Exhibit no. 195 and read in open court. S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 37–62. Copies of petitioner's written statement also appear at S.F. Trial, Volume 29 (State Exhibit 5 from the hearing on petitioner's motion to suppress) and Volume 30 (State Exhibit 195 from trial).

**20.** S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 49–55.

**21.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 237–38.

**22.** Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), at pp. 4–6.

**23.** *Id.*

testified (1) petitioner appeared anxious when she spoke with him, (2) when petitioner indicated he wanted to get something off his chest, she halted her interview of petitioner and had the booking sergeant take petitioner away, (3) while petitioner was anxious and upset, she did not consider him suicidal, and (4) petitioner's exact words to her were that he would feel better if he got something off his chest.[24]

A San Antonio Police detective testified (1) on April 7, 2001, he received a call from the jail around 11:40 a.m. saying that a person arrested in a homicide wished to talk regarding the case, (2) he paged Detective Carian, and (3) the day before, i.e., on April 6, 2011, petitioner's interview with Detective Carian had terminated as soon as petitioner asked for an attorney.[25]

The detective who took petitioner's written statement on April 7, 2001 testified (1) he had contact with Asel Abdygapparova on April 6, 2001 and Abdygapparova furnished information which led to the discovery of Rosado's body and the arrests of petitioner and Minjarez, (2) Abdygapparova identified petitioner as her boyfriend and identified a motel from which evidence was recovered, (3) after petitioner's arrest on April 6, 2001, he personally read petitioner his rights off a printed card, (4) petitioner claimed initially that he didn't know Minjarez or Abdygapparova, (5) petitioner later admitted he knew Minjarez but denied any knowledge of the offense and then requested a lawyer, (6) the following date, April 7, 2001, while in Austin, he received a page shortly before noon indicating the petitioner wanted to speak with him, (7) when he arrived at the BCADC, he once more read petitioner his rights, (8) petitioner indicated he was willing to talk with police and to go to the police homicide office, (9) petitioner claimed Minjarez actually committed the offense, (10) petitioner carefully edited the first and final drafts of the written statement, making many changes thereto, (11) no promises or threats were made to petitioner to induce petitioner's statement, (12) petitioner indicated he understood his rights, (13) petitioner was furnished with drinks and snacks and given restroom breaks during his interview, (14) the detective was unaware petitioner was taking any prescribed medications for depression or that petitioner had been in contact with the BCADC's mental health department, (15) petitioner's demeanor during his April 7, 2001 interview was "serious," not emotional, (16) he did confront petitioner with the statements of both Abdygapparova and Minjarez, and (17) petitioner appeared to have a rational understanding of the facts of the case, made sense, and did not appear to be "out of it" or to be unaware of what was going on.[26]

At the conclusion of the hearing, the state trial judge denied petitioner's motion to suppress petitioner's written statement.[27]

## H. *Additional DNA Testing*

More sophisticated DNA testing revealed that (1) petitioner could not be excluded as a possible donor of the sperm fraction of the anal swab from Priscilla Almares' rape kit[28] and (2) Minjarez could

**24.** S.F. Trial, Volume 2, testimony of Kim Robinson, at pp. 4–17.

**25.** S.F. Trial, Volume 2, testimony of Barney Dale Whitson, at pp. 18–26.

**26.** S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 26–59.

**27.** S.F. Trial, Volume 2, at p. 63.

**28.** S.F. Trial, Volume 24, testimony of Garon Foster, at pp. 50–54; testimony of Meghan

not be excluded as a possible source of semen found on a carpet stain in the motel room to which Abdygapparova led police.[29]

## I. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced on October 1, 2002.

### 1. The Prosecution's Case

In addition to the evidence summarized above, including petitioner's written statement which was read in open court, the jury also heard testimony from the Bexar County medical examiner who testified (1) Rosado died as a result of asphyxiation, (2) Rosado's body showed indications that pressure had been applied to the back of her neck, causing hemorrhaging into the whites of her eyes, (3) he was unable to determine the precise manner in which Rosado had been asphyxiated, (4) both Sarah Gonzales and Priscilla Almares were strangled but he was unable to determine if the precise method of strangulation was manual or a ligature, (5) to cause death by strangulation, it would be necessary to apply pressure for somewhere between ninety seconds to two and a half minutes, (6) unconsciousness can be achieved in the average adult by applying pressure to the neck for ten to fifteen seconds, (7) Rosado suffered reddish and greenish bruises on her face, forehead, chin, the bridge of her nose, and cheeks, as well as multiples bruises on her arms and legs (8) Rosado suffered chemical burns on her right cheek as a result of application of an alkaline compound such as lye bleach, (9) Rosado also suffered bleaching stains on her upper torso, (10) Rosado suffered multiple he-

morrhages, contusions, and abrasions to her vaginal area, (11) Rosado's head injuries were consistent with her having been beaten about the head, i.e., with blunt force trauma to the head, (12) Rosado's leg injuries were consistent with her leg having been caught in a closing car door, as petitioner indicated in his written statement, (13) Sarah Gonzales suffered multiple bruises to her forehead and the left side of her face, as well as the back of her neck, (14) internal bleeding was observed in both of Sarah's eyes, (15) Sarah suffered a laceration, a contusion, and multiple abrasions to her vaginal area, as well as trauma to her hymen and bruising and hemorrhaging of her vaginal walls consistent with vaginal penetration, (16) Priscilla Almares also suffered facial injuries, Petechiae in the her facial skin and the whites of both her eyes, (17) Priscilla suffered scrapes to the left side of her chest, (18) Priscilla suffered multiple vaginal lacerations consistent with vaginal penetration, (19) while both Sarah and Priscilla suffered post-mortem ant bites, their bodies were unusually clean for a sexual assault case,(20) all three case showed similarities, to wit, all were young females who were abducted, sexually assaulted, beaten about the head, killed by asphyxiation in a manner he could not definitively determine but which indicated they had not offered much resistance, (21) all three victims had pressure applied to their necks, and (22) Rosado's body had been cleaned with bleach and the two girls' bodies appeared unusually clean.[30]

### 2. The Defense's Evidence

An acquaintance of Sarah and Priscilla testified (1) she saw Sarah and Priscilla at

---

Clement, at pp. 92–94. One DNA expert testified that a small amount of foreign genetic material was found in Priscilla's vaginal area but the material was insufficient for DNA testing. *Id.*, Volume 24, testimony of Garon Foster, at p. 84.

**29.** S.F. Trial, Volume 24, testimony of Garon Foster, at pp. 45–48, 71.

**30.** S.F. Trial, Volume 24, testimony of Vincent DiMaio, at pp. 131–40, 151–79.

Westlakes Mall on the evening of December 16, 1994 in the company of a young man, possibly around age 19 or 20, whom she had not met before and who did not appear to want to look at her, (2) she later saw the two girls riding in a minivan driven by an unidentified male, and (3) a person she did not know later showed her a Polaroid photograph of Priscilla naked with three guys who were throwing gang signs.[31] On cross-examination, however, she admitted her statement to police indicated the date she had seen the two girls was December 12, 1994 and she had not gone to the police when she learned of the girls' deaths on December 17, 1994.[32]

A resident of the area from which the girls disappeared testified that, on December 16, 1994, he observed Sarah and Priscilla walking down the street and being followed by three young, teenage guys who appeared to be harassing the girls.[33]

Another witness testified (1) he saw two girls walking during the early morning hours of December 17, 1994 near the access road to Loop 410 near Marbach Road, (2) the girls appeared to be having trouble with a group of guys in a pickup truck with whom the girls were arguing, (3) petitioner was not among the men in the pickup truck, (4) he was not certain the two petite girls he had seen were Sarah and Priscilla,

and (5) the guys in the pickup truck were wearing gang attire.[34]

A psychiatrist employed at the BCADC reviewed for the jury's benefit the petitioner's history of medications on April 7, 2001, pointing out petitioner's BCADC medical records indicated (1) petitioner received 20 mg of Prozac at approximately 11:05 a.m. on that date, or the equivalent of "a couple cups of coffee," and (2) petitioner appeared anxious but coherent and said he would feel better if he got something off his chest.[35]

### 3. The Verdict

On October 9, 2001, the jury returned its verdict at the guilt-innocence phase of petitioner's trial, finding petitioner guilty of capital murder, as charged in the indictment.[36]

## J. Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on October 10, 2002.

### 1. The Prosecution's Evidence

A former neighbor of the petitioner's family testified about an incident in April, 1986 in which he and his wife returned home to find their home had been "turned upside down" and law enforcement officers later found his television in the kids' bed-

---

31. S.F. Trial, Volume 25, testimony of Tina Marie Garcia, at pp. 10–31.

32. *Id.*, at pp. 36–37.

33. S.F. Trial, Volume 25, testimony of Kelvin Payne, at pp. 39–55.

34. S.F. Trial, Volume 25, testimony of Russell Gutierrez, at pp. 66–86.

35. S.F. Trial, Volume 25, testimony of Dr. Ceasar Garcia, at pp. 111–16.

36. S.F. Trial, Volume 26, at pp. 124–25; Trial Transcript, at p. 263; State Habeas Transcript, Volume II, at p. 336.

Petitioner's co-defendants, Santos Minjarez and Asel Abdygapparova, were separately convicted and sentenced in connection with the same offense. Like petitioner, Minjarez was convicted in large part based upon a written statement Minjarez gave to police in which Minjarez attempted to down-play his role in Rosado's murder and to portray Hernandez and Abdygapparova as the real instigators of the offense. *Minjarez v. State*, AP–74,592, 2005 WL 3061981, *2–*3 (Tex.Crim. App. November 16, 2005).

room next door, his wife's jewelry box in an ice chest in their backyard, and his wallet on top the roof (minus all credit cards).[37]

An eyewitness and several law enforcement officers testified about an incident in April, 1990 in which petitioner and another man broke down the door of a home, burglarized the residence, and fled on foot when police arrived.[38]

A trio of San Antonio Police Officers testified about an incident in June, 1990 in which petitioner was arrested for auto theft and possession of an illegal knife.[39]

A pair of witnesses who were once neighbors of petitioner testified about an incident in January, 1991 in which (1) petitioner invited a male neighbor to petitioner's apartment to watch a porn video, (2) petitioner left his apartment on a pretext and locked the male neighbor inside petitioner's apartment, and (3) petitioner then went to the neighbor's apartment and raped his neighbor's wife.[40]

The victim of a residential burglary testified about having her home burglarized in April, 1991 and, later, obtaining the return of all her stolen property.[41]

A quintet of law enforcement officers testified about an incident in March, 1994 in which petitioner and Minjarez burglarized a house, led police on a high speed chase (at least briefly driving the wrong way on a major highway), wrecked their vehicle, and then fled on foot across a busy thoroughfare.[42]

A quartet of BCADC employees testified about an incident in August, 2002, in which the petitioner was caught late at night hiding in a cell other than his own in the midst of an attempted escape that involved cutting through cinder block walls and concealing the resulting holes with a home-made, stucco-like, substance.[43]

The prosecution also introduced documents establishing petitioner had previously been convicted of (1) multiple counts of burglary of a habitation with intent to commit theft and one count of carrying an illegal knife [44] and (2) burglary with intent to commit sexual assault.[45]

**37.** S.F. Trial, Volume 27, testimony of Hiram J. Crowder, at pp. 53–60.

**38.** S.F. Trial, Volume 27, testimony of Vincent Mosqueda, at pp. 60–64; testimony of Andres Ortiz, at pp. 64–71; testimony of Johnny Teran, at pp. 72–74; testimony of Robert Anthony Rosales, at pp. 110–13; testimony of Abel Rodriguez, at pp. 113–17.

**39.** S.F. Trial, Volume 27, testimony of Antonio Zayas, at pp. 78–87; testimony of Tamara Ford, at pp. 89–94; testimony of Daryl Volkman, at pp. 95–99.

**40.** S.F. Trial, Volume 27, testimony of Danny G. Zapata, at pp. 22–29; testimony of Anna Diaz, at pp. 105–09.

A San Antonio Police officer who responded to that rape call and arrested petitioner on January 12, 1991 testified Santos Minjarez was also present at the time of petitioner's arrest and Minjarez gave the name "Ernest Perez" and left the scene. S.F. Trial, Volume 27, testimony of James David McDonald, at pp. 189–90.

**41.** S.F. Trial, Volume 27, testimony of Joan Anderson, at pp. 99–103.

**42.** S.F. Trial, Volume 27, testimony of Russell Lucas, at pp. 136–39; testimony of Enrique Cantu, at pp. 135–57; testimony of Steve Amerson, at pp. 158–63; testimony of Dennis Robert Casillas, at pp. 164–71; testimony of Abel V. Rodriguez, at pp. 172–81.

**43.** S.F. Trial, Volume 27, testimony of Arthur Poole, at pp. 190–232; testimony of Paul Tom Powers, at pp. 45; testimony of Mark Flores, at pp. 245–48; testimony of Charles Campbell, at pp. 249–54.

**44.** S.F. Trial, Volume 27, testimony of David Dunbar, at pp. 10–19.

**45.** S.F. Trial, Volume 27, testimony of Michael Gonzalez, at pp. 33–44.

## 2. *The Defense's Evidence*

Petitioner's trial counsel presented evidence showing that all charges against petitioner arising from the incident in June, 1990 were subsequently dismissed for insufficient evidence.[46]

A psychiatrist who had interviewed petitioner testified (1) petitioner possessed normal intelligence, (2) petitioner had a normal family development until age 15 (i.e., in 1986), when petitioner's father was murdered, (3) petitioner felt guilt and experienced depression and mental health problems thereafter, (4) petitioner was diagnosed with post traumatic stress disorder ("PTSD"), anxiety disorder, and major depressive disorder and subsequently developed significant symptoms, entered treatment, and remained intermittently on medication for the next fifteen years, (5) among the medications prescribed for petitioner were Prozac, Klonopin (described by the witness as a mild tranquilizer), Thorazine, and Trazodone, (6) petitioner was admitted to the hospital at least twice for his depression and PTSD relating to his father's death, (7) petitioner has a documented mental illness stemming from the traumatic murder of petitioner's father that petitioner observed at a young age, (8) petitioner has been chronically depressed for many years, (9) the physician found no indications petitioner was malingering, and (10) it was unusual for a person with an antisocial personality to be clinically depressed because such persons typically lack a conscience.[47]

On cross-examination, however, the same physician testified (1) petitioner got a girlfriend pregnant at age fifteen, a different girlfriend pregnant at age 16, and Asel Abdygapparova was pregnant with petitioner's child at the time of Rosado's murder, (2) petitioner is not retarded, (3) petitioner was diagnosed in both 1994 and 1996 with anti-social personality disorder, which features recurrent violations of social norms, an inability to learn from past experience, disregard for the rights and property of others, and a lack of social conscience, (4) petitioner had been through the juvenile justice system and was on probation prior to his father's murder, (5) petitioner's mental health indicate petitioner tends to blame others for his own conduct, (6) petitioner told one of his treating doctors that he liked to fight, (7) petitioner was found by one interviewer to be manipulative and head strong, (8) petitioner used marijuana, LSD, and alcohol all before the age of 16, (9) petitioner tends to be aggressive toward others and deceitful, (10) impulsiveness is high among antisocial personalities, (11) petitioner has a long history of not caring for his children and not paying child support, (12) petitioner has experienced significant periods of unemployment and was frequently absent from work when employed, and (13) petitioner's antisocial personality means petitioner lacks empathy for others and tends to engage in exploitive and irresponsible sexual relations.[48]

Petitioner's aunt testified petitioner was a good man, a hard worker, very intelligent, on the Dean's List at college, good with children, very respectful and polite, had problems as a juvenile arising from his

---

**46.** S.F. Trial, Volume 27, testimony of Michael Gonzales, at pp. 9–25. Petitioner's records did show petitioner was sentenced to serve a 17-year term of imprisonment in cause no. 1994–CR–2000B on March 10, 1997. *Id.*, at p. 25.

**47.** S.F. Trial, Volume 28, testimony of Edward Brown Gripon, at pp. 39–68, 98–106.

**48.** *Id.*, at pp. 68–98.

father's murder which were noticeable as early as his father's funeral, and deserved to live.[49]

**49.** S.F. Trial, Volume 28, testimony of Andrea Torres, at pp. 110–17.

**50.** More specifically, a friend of petitioner testified petitioner (1) was a "great individual," who cared for his family, (2) helped his family and friends, (3) inspired others to get their education, (4) taught him "family values," and (5) was not a threat to society. S.F. Trial, Volume 28, testimony of Joe Vargas, at pp. 119–24.

Petitioner's sister-in-law testified petitioner (a/k/a "Casper") was a good person, close to his family, a very good father, and felt responsible and guilty about his father's death. S.F. Trial, Volume 28, testimony of Elizabeth Hernandez, at pp. 126–30.

One of petitioner's younger brothers testified that (1) prior to their father's murder, petitioner had been a good brother, (2) after their father's murder, petitioner dropped out of school and started using drugs and alcohol, (3) petitioner thereafter became "detached" from the rest of their family and began staying out late, (4) petitioner went to prison at age 18 and was worse after his release, (5) in the late–1990's petitioner began getting his life back together, attending Palo Alto College, (6) petitioner and Eloise stayed with petitioner's mother for a couple years and had a place of their own at one time, (7) petitioner encouraged him not to drop out of school, and (8) petitioner was a "real caring, real loving" person who cried when re-living their father's death. S.F. Trial, Volume 28, testimony of Mario Hernandez, at pp. 131–37.

Petitioner's younger sister testified (1) before their father's murder, petitioner was close to her, (2) after their father's murder, petitioner lived with other relatives and just couldn't cope, (3) petitioner was outside calling to his father to come inside when she heard a gunshot and their father fell on the floor, (4) petitioner held his father in his arms as their father breathed his last, (5) petitioner went to prison at age 18 for burglaries and was depressed upon his release, (6) petitioner was hospitalized after their father's death and has received drug and alcohol treatment, and (7) petitioner went back to school and attended Palo Alto College. S.F. Trial, Volume 28, testimony of Melissa Arnold, at pp. 138–45.

Several of petitioner's friends and other family members testified to petitioner's good character and good personality traits.[50]

Petitioner's mother testified (1) petitioner was the oldest of four sons and a daughter, (2) she has been widowed since 1986, (3) petitioner was close to his father, (4) petitioner was always very smart, (5) petitioner was inside urging his father to come inside when a crowd approached the house and one person shot petitioner's father, (6) when petitioner's father died, he lost his role model, (7) thereafter, petitioner lost interest in school and was admitted to Santa Rosa after attempting suicide, (8) petitioner was readmitted to Santa Rosa in 1987 for suicide, (9) petitioner went to prison for burglaries, (10) petitioner did not abuse alcohol after his release from prison, (11) she furnished a home to petitioner, Eloise, and their kids in the early–1990's, (12) Eloise had petitioner's first child when he was fifteen and Eloise was seventeen, (13) petitioner and Eloise divorced, (14) petitioner also had a child by Asel, and (15) petitioner is not an animal or a cruel, cold-hearted, person but, rather, is a "very loving, caring" person who could not kill anyone. S.F. Trial, Volume 28, testimony of Gloria Hernandez, at pp. 146–58.

Petitioner's male cousin testified (1) he has known petitioner his entire life, (2) petitioner loves his mother very much and has been there for his mother since his father's death, (3) petitioner's family lived with his family following the murder of petitioner's father, (4) petitioner's brothers Mario and Danny both dropped out of school after their father's murder, (5) petitioner felt guilty over his father's murder, (6) gang members who lived across the street from petitioner's family were responsible for the murder of petitioner's father, (7) petitioner became depressed after his father's murder, withdrew, and began hanging around with Santos Minjarez in high school, (8) when he dropped out of college in 1994, petitioner helped him find a job in construction, (9) petitioner got his GED and enrolled at Palo Alto College, and (10) petitioner was affectionate toward his children even after the divorce. S.F. Trial, Volume 28, testimony of Richard Torres Jimenez, Jr., at pp. 158–68.

Another of petitioner's younger brothers, a Marine Corps recruiter, testified (1) petitioner advised him to stay on the straight road, (2) petitioner wrote him from prison encouraging

### 3. *The Verdict*

On October 11, 2002, the jury returned its verdict at the punishment phase of petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society, (2) beyond a reasonable doubt the defendant actually caused the death of Rosa Rosado or did not actually cause the death of Rosa Rosado but intended to kill Rosa Rosado or another or he anticipated that a human life would be taken, and (3) taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the defendant's personal moral culpability, there was insufficient mitigating circumstance to warrant a sentence of life impris-

onment rather than a sentence of death.[51] The state trial court imposed sentence.[52]

### K. *Direct Appeal*

Petitioner appealed his conviction and sentence. In a brief filed December 19, 2003, petitioner asserted five points of error.[53] In an unpublished opinion issued March 23, 2005, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Hernandez v. State*, AP–74,451 (Tex.Crim.App. March 23, 2005).[54] Petitioner did not thereafter seek certiorari review of his conviction or sentence by the United States Supreme Court.

### L. *State Habeas Corpus Proceeding*

On October 6, 2004, petitioner filed an application for state habeas corpus relief in

---

him to go back to school, (3) petitioner took a lot of blame for their father's death, (4) "it just really tore us apart for a long time," and (5) after their father's death, petitioner distanced himself from their family. S.F. Trial, Volume 28, testimony of Danny Hernandez, at pp. 168–78.

**51.** S.F. Trial, Volume 28, at pp. 231–32; Trial Transcript, at pp. 277–80; State Habeas Transcript, Volume II, at pp. 350–54.

**52.** S.F. Trial, Volume 28, at pp. 232–33. The Judgment entered October 15, 2002 in petitioner's trial court proceeding appears at several places in petitioner's state court records, including at Trial Transcript, at pp. 284–85; State Habeas Transcript, Volume I, at pp. 90–91; and State Habeas Transcript, Volume II, at pp. 358–59.

**53.** As points of error on direct appeal, petitioner argued (1) the evidence was legally and factually insufficient to sustain the jury's guilty verdict, (2) the trial court erred when it failed to set aside the indictment because the indictment failed to give sufficient notice of the manner and means of the offense charged, (3) the trial court erred when it failed to grant defendant's motion to suppress the defendant's oral statement because of a lack of

voluntariness, (4) the trial court erred when it allowed the prosecution to admit repetitious exhibits which were more prejudicial than probative, and (5) defendant was denied his constitutional right to the effective assistance of counsel by virtue of his trial counsel's failure to obtain assistance from the trial court in locating potential witnesses and failing to object to evidence offered by the prosecution.

**54.** The Texas Court of Criminal Appeals (1) found the evidence, particularly petitioner's written statement, sufficient under the Texas law of parties to support petitioner's conviction for capital murder, (2) rejected on the merits petitioner's argument that his indictment failed to give proper notice of the charge against petitioner, (3) declared petitioner's third point of error "multifarious and inadequately briefed," (4) held petitioner had failed to explain why the photographs petitioner complained should not have been admitted were more prejudicial than probative, and (5) held petitioner had failed to demonstrate his trial counsel's performance in failing to locate certain witnesses was objectively unreasonable under the circumstances and held petitioner had failed to identify the exhibits to which his trial counsel should have objected.

which he asserted a dozen grounds for relief.[55]

October 25–26 and 30–31, 2007, the state habeas trial court held an evidentiary hearing on petitioner's grounds for state habeas corpus relief.[56] The primary focus of the evidentiary hearing was the voluntariness of petitioner's written statement executed April 7, 2001.

### 1. Petitioner's Testimony

After introducing voluminous copies of petitioner's medical and mental health records from the BCADC, the Center for Health Care Services (where petitioner was treated for PTSD, depression, and anxiety disorder following his release on parole from prison), and other facilities, petitioner took the stand at the state habeas hearing, offered his own six-page affidavit,[57] and then submitted to cross-examination by the State.

**55.** As grounds for relief, petitioner argued (1) there was insufficient evidence showing the murders of Sarah Gonzales and Priscilla Almares were committed in the course of the same scheme or course of conduct as the murder of Rosa Rosado, (2) his trial counsel rendered ineffective assistance by failing to prevent the state from pleading and proving the murder of Gonzales and Almares were part of the same scheme or course of conduct as Rosado's murder, (3) the trial court erroneously admitted petitioner's involuntary written statement, (4) petitioner's waiver of his right to refrain from self-incrimination was involuntary, (5) the state violated petitioner's rights to remain silent and to the assistance of counsel, (6) his trial counsel rendered ineffective assistance by failing to present available evidence showing petitioner's written statement was involuntary, (7) petitioner's conviction and sentence of death violate the principle announced in *Apprendi* because the jury was not required to find beyond a reasonable doubt the absence of all mitigating evidence warranting a life sentence, (8) his trial counsel rendered ineffective assistance by failing to object to the absence of a "beyond reasonable doubt" burden of proof in the mitigating evidence special issue, (9) his appellate counsel rendered ineffective assistance by failing to raise this same *Apprendi* argument as a point of error on direct appeal, (10) his trial counsel rendered ineffective assistance by failing to object to prosecutorial closing argument at the punishment phase of trial inviting the jury to speculate on how the victim's families' felt about the appropriate punishment, (11) his appellate counsel rendered ineffective assistance by failing to raise points of error challenging the trial court's failure to quash the indictment based upon *Apprendi,* and (12) his appellate counsel rendered ineffective assistance by failing to raise points of error regarding the trial court's denial of petitioner's requests to have detective Carian testify regarding the contents of Asel Abdygapparova's written statement that Minjarez actually raped and murdered Rosado.

**56.** The verbatim transcription of those four days of evidentiary hearing appear at S.F. State Habeas Hearing, Volumes 2–5.

**57.** Petitioner's six-page affidavit was admitted into evidence during the evidentiary hearing held in petitioner's state habeas corpus proceeding and is found at S.F. State Habeas Hearing, Volume 10, at pp. 1051–56.

In his affidavit, petitioner asserted (1) his trial counsel never advised him of his right to testify during the hearing on petitioner's motion to suppress his statement, (2) Dr. Wilson prescribed Klonopin for many years to help petitioner sleep, (3) in October, 2000, a new physician, Dr. Stowe, began reducing petitioner's Klonopin prescription over several months from four milligrams a day to a single milligram daily, (4) petitioner continued to take four milligrams of Klonopin daily, supplementing his own supply of Klonopin by obtaining additional pills from his uncle, (5) during this time frame, petitioner nonetheless often ran out of Klonopin half way through his 30–day prescription, (6) by March 29, 2011, petitioner was no longer able to supplement his Klonopin and attempted unsuccessfully to get Dr. Stowe to reconsider his decision to take petitioner off Klonopin, (7) at the time of petitioner's arrest he had not taken Klonopin in three days and was going "cold turkey" from Klonopin withdrawal, (8) petitioner had experienced Klonopin withdrawal symptoms before, which he described as including feeling blood flowing through his

The thrust of petitioner's testimony before the state habeas court was his assertion that he had been suffering from severe withdrawal symptoms, relating to his abuse of the prescription medication Klonopin, at the time of his arrest and during both of his interviews by detective Carian on April 6 and 7, 2001, during which interviews petitioner claimed he begged for medication while Carian mocked petitioner's obvious signs of withdrawal and threatened to withhold any medication from petitioner until petitioner furnished a statement that was consistent with the written statement given previously by Abdygapparova.[58]

More specifically, petitioner testified in pertinent part that (1) Dr., Wilson had prescribed Klonopin for years to help petitioner sleep, (2) Klonopin is highly addictive, (3) in October, 2000, Dr. Stowe began to reduce petitioner's Klonopin prescription, (4) nonetheless, petitioner continued to take the same dosage of Klonopin by supplementing his own prescription with additional Klonopin he obtained from his uncle Joe Torres, (5) he had only one and a half milligrams of Klonopin in his possession on March 29, 2001 and was unable to obtain any additional supply thereafter, (6)

head, extreme nervousness, his body convulsing involuntarily, his arms and legs jerking, loss of balance, hyperventilation, insomnia, and panic attacks, (9) he began experiencing panic attacks as soon as detective Carian began interrogating petitioner on April 6, (10) he told Carian what was wrong and that he needed medications but Carian just laughed and accused petitioner of faking these episodes, (11) petitioner began trembling and shaking uncontrollably, (12) during the ensuing five-hour interrogation, Carian repeatedly threatened petitioner with the death penalty unless petitioner cooperated, (13) Carian refused to arrange for petitioner to receive medications unless petitioner gave a statement, (14) when petitioner invoked his right to counsel within five minutes of the start of interrogation on April 6, Carian just smiled, (15) Carian wanted petitioner to confirm Abdygapparova's statement, (16) after five hours, Carian finally honored petitioner's requests for an attorney and to terminate the interview, (17) petitioner was taken to the BCADC, where he received 20 mg of Prozac after petitioner's mother delivered said medication to the jail, (18) "I wanted to see a doctor who could prescribe Klonopin. I knew from experience that the jail doctors will issue practically any drug as long as it will keep you from being a disruption.", (19) petitioner was finally booked into the BCADC at 2 a.m. on April 7, 2001, (20) he began to grow suicidal and couldn't sleep, (21) sometime around noon, he told a POD officer he wanted to kill himself, (22) when he was taken to see Kim Robinson, he became panicky and told her about his need for medication and that he was going crazy, (23) he told Robinson he needed to see a doctor because he needed to get "all these things off my chest," (24) he told Robinson he hadn't slept in days and had been experiencing panic attacks, (25) when Robinson informed him she could not furnish him with medications, petitioner became hysterical and demanded that she call a doctor, (26) Robinson left and brought a floor sergeant named Contreras, who informed petitioner that he needed to talk to an investigator, not a doctor, (27) when petitioner was later taken down to an interrogation room and saw detective Carian, petitioner became frightened and told Carian "she wasn't supposed to be killed and that it was only supposed to be a robbery," (28) petitioner did not want to give a statement but wound up at the homicide office, (29) petitioner was tired and sick and only gave a statement because he feared to refuse to do so would result in him not getting to see a doctor or any medication for his panic attacks, (30) neither Carian, Robinson, nor Contreras would get petitioner a doctor, and (31) neither of his trial counsel ever asked petitioner about the circumstances surrounding the taking of petitioner's statement and never discussed with petitioner whether he should testify at the hearing on the motion to suppress. S.F. State Habeas Hearing, Volume 10, affidavit of Ramon Hernandez, at pp. 1051–56.

58. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 18–76, 173–302.

he experienced severe symptoms of Klonopin withdrawal during both his interviews with detective Carian, including the sensation of blood rushing through his head, feelings of tenseness and nervousness, the involuntary shaking of his arms and legs, hyperventilation, a racing heartbeat, and uncontrollable shaking and trembling, (7) Carian repeatedly threatened petitioner with the death penalty unless petitioner gave a statement and refused to honor petitioner's requests for an attorney and to terminate their interview on April 6 until detective Barney Whitson arrived, (8) petitioner told the booking nurse he was going through withdrawal, (9) his mother subsequently brought petitioner's medications to the jail but he was given only Prozac on April 7, (10) he was unable to sleep and was suicidal following his arrest, (11) when he told the POD officer he was suicidal, he was taken to see Kim Robinson, (12) he told Robinson about his interrogation and the threats Carian had made, informed Robinson he was withdrawing from Klonopin, and said he needed to see a doctor because he "needed to get these things off my chest," (13) when Robinson informed him there was no doctor available, petitioner became hysterical and demanded to see a doctor, (14) Robinson then got officer Contreras, whom petitioner also informed he needed medications, (15) when he was taken to see Carian on April, 7, petitioner was tired, disoriented, and his body was jerking uncontrollably, (16) it took eight hours for petitioner to give and correct his statement on April 7, (17) the panic attack petitioner experienced during his interview on April 7 did not affect his memory or his ability to edit his written statement, (18) Carian told petitioner his statement should conform to Abdygapparova's statement, (19) when petitioner told Robinson and Conteras he wanted to "get things off his chest," he had not intended to suggest he wanted to talk to a detective about his case but, rather, meant he wanted to talk to a doctor about his medication, (20) he told officer Contreras he was suicidal and needed to see a doctor, (21) he drank beer and liquor the first week in April, 2001 to ameliorate the effects of his Klonopin withdrawal, (22) the only reason petitioner gave his written statement on April 7 was his belief, based on Carian's statements on April 6, that petitioner would continue to be denied Klonopin unless petitioner gave a statement, and (23) he did not discuss with his trial counsel either the circumstances surrounding the giving of his written confession, his mental condition, or the fact he was going through Klonopin withdrawal at the time he gave his written statement.[59]

## 2. *Petitioner's Experts*

Dr. Paula Kathleen Lundberg–Love, a professor of psychology and expert psycho-pharmacologist, testified in pertinent part that (1) based upon her review of petitioner's medical and mental health records, as well as her clinical interview of petitioner, petitioner had clearly experienced a traumatic event, i.e., the fatal shooting of petitioner's father, which caused petitioner to suffer from post traumatic stress disorder ("PTSD"), (2) the petitioner also suffered from panic disorder, a condition characterized by overwhelming anxiety, (3) petitioner also suffered from major depression, including suicidal ideation, (4) Klonopin is a Benzodiazepine drug designed to reduce anxiety and is no longer a drug of choice to treat panic disorder because patients tend to

---

**59.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 18–41, 46–76, 181–206, 210–60, 265–302.

develop tolerance and dependance on same, (5) persons coming off Benzodiazepine drugs may experience enhanced anxiety, (6) after his release from prison, petitioner's anxiety disorder had been treated initially with Ativan and Paxil, (7) later Buzbar was added and, even later, petitioner was treated with Ativan, Inderal, and Paxil, (8) eventually, petitioner was prescribed Prozac in lieu of Paxil, in part because of the negative sexual side-effects of Paxil on petitioner, (9) in June, 1998, Dr. Wilson switched petitioner from Ativan to Klonopin, which is a longer-acting medication, (10) petitioner took 4 rag of Klonopin daily from June, 1998 until August, 2000, when Dr. Stowe began reducing petitioner's dosage of Klonopin, (11) by the late–1990's Benzodiazepine drugs were contraindicated for anxiety disorder and PTSD because of the tendency of patients to develop iatratenic drug dependence, i.e., physician-induced dependence, (12) she questioned whether petitioner's reduction in Klonopin dosage from 4 mg to 1 mg daily was too rapid, (13) a person who had taken Klonopin for a sustained period of time and experienced a reduction of dosage from 4 mg to 1 mg daily would likely experience "breakthrough symptoms of anxiety," (14) petitioner's testimony regarding his symptoms during his interviews with Carian was consistent with what she believed a person experiencing rapid withdrawal from Klonopin, (15) Klonopin withdrawal causes significant anxiety symptoms and is exacerbated by alcohol use, (16) maximum symptoms may be delayed as much as a week but, in as little half a week, symptoms would be disruptive and would contravene a patient's ability to function normally, (17) withdrawal from Klonopin is also exacerbated by simultaneous withdrawal from alcohol, (18) petitioner reported to her that he experienced hyperventilation and trembling shortly after his arrest, (19) Klonopin withdrawal could cause elevated heart rate and pulse, shallow respiration, and trembling, (20) petitioner's vital signs taken on April were all in or near the normal range but that fact did not rule out the possibility of Klonopin withdrawal, (21) while Prozac would ameliorate the symptoms of depression and help PTSD, it would not help with Klonopin withdrawal, (22) she was unable to say whether petitioner's written statement on April 7, 2001 was voluntary, and (23) nothing in petitioner's clinical interview or testimony was inconsistent with Klonopin withdrawal.[60]

The psychiatrist who treated petitioner from August, 2000 to March, 2001, Dr. Robert H. Stowe, testified in pertinent part that (1) Dr. Wilson had prescribed Prozac and Klonopin for petitioner, (2) he decided to taper down petitioner's dosage of Klonopin, in part because of petitioner's diagnosis of poly-substance abuse/dependence, (3) Dr. Wilson had prescribed up to 6 mg of Klonopin daily and Dr. Stowe was concerned about the possibility of cross-addiction, (4) it would have been easy for petitioner to become addicted to a Benzodiazepine drug like Klonopin, (5) he did not intend to substitute another drug for Klonopin because he believed Prozac would be sufficient to treat petitioner's symptoms, (6) the typical symptoms of Klonopin withdrawal include anxiety, convulsions, tremors, increased blood pressure, increased heart rate, sweating, agitation, increased motor restlessness, and seizures, (7) over a period of several months he weaned petitioner off Klonopin and in February, 2011, he discontinued

**60.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Dr. Paula Kathleen Lundberg–Love, at pp. 78–166.

any Klonopin for petitioner, (8) he believed petitioner successfully adjusted to the gradual reductions in dosage of Klonopin, (9) in early 2001, petitioner indicated to Dr. Stowe that he was only taking 20 mg of Prozac daily, instead of the prescribed 30 mg daily and he was only taking Klonopin on an "as needed" basis rather than as prescribed, (10) psychotropic medications are only effective when taken as prescribed, (11) a sudden stop of Klonopin after taking high doses would result in extreme agitation, (12) Klonopin withdrawal would normally include anxiety, insomnia, restlessness, high blood pressure, and rapid heart rate, (13) nonetheless, he would not expect Klonopin withdrawal to affect a person's judgment, (14) he was never contacted by petitioner's trial counsel, (15) he never saw any signs of Klonopin withdrawal while treating petitioner but did see increased anxiety, (16) he prescribed Trazodone to help with petitioner's insomnia, not as a substitute for Klonopin, (17) he was satisfied with petitioner's anxiety symptoms until petitioner's last visit on March 29, 2001, when he became concerned about petitioner's symptoms, (18) he had no knowledge that petitioner was ever taking more than the prescribed dosage of Klonopin, (19) it is possible, if petitioner's account of his over-self-medication is true, the petitioner was experiencing Klonopin withdrawal on April 6, 2001, (20) petitioner never appeared to resist his efforts to reduce petitioner's Klonopin dosage, (21) a person who had been on. Klonopin for five years would have a riskier withdrawal than a patient who had been the medication less time, (22) reducing the dosage of petitioner's Klonopin would not have done any good if petitioner had been supplementing from other sources, (23) withdrawal from Benzodiazepine drugs like Klonopin is much more medically significant than withdrawal from heroin or cocaine and can cause life-threatening seizures and extreme elevations in blood pressure and heart rate, which can lead to stroke or heart attack, (24) petitioner's anxiety level in 2001 was consistent with petitioner supplementing his Klonopin to maintain the prior dosage before Dr. Stowe began tapering down petitioner's dosage, (25) petitioner's "normal" vital signs taken at 11:58 a.m. on April 7, 2001 were not indicative of Klonopin withdrawal, (26) Klonopin withdrawal symptoms are not necessarily apparent to an observer, (27) a person withdrawing from Klonopin might have difficulty focusing on details, (28) petitioner typically manifested panic symptoms intermittently, and (29) by March 29, 2001, petitioner knew the name of the medication Klonopin.[61]

### 3. *Petitioner's Trial Counsel*

Attorney Michael Ugarte testified (1) he had petitioner's medical records and BCADC classification records prior to the hearing on petitioner's motion to suppress, (2) petitioner's trial counsel had petitioner evaluated by a court-appointed mental health expert, Dr. Gripon, (3) Ugarte became aware that petitioner was receiving mental health services, (4) he was aware petitioner had been diagnosed with PTSD and major depression, (5) he was aware petitioner had been prescribed Klonopin, (6) he spoke with petitioner regarding petitioner's dealings with Dr. Wilson, (7) both of petitioner's trial counsel and Dr. Gripon had discussions with petitioner regarding the circumstances surrounding petitioner's giving of his written statement, (8) had

---

61. S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at p. 9– 46.

petitioner's trial counsel been aware of petitioner's alleged Klonopin withdrawal at the time petitioner gave his statement, they would have explored that subject further, (9) petitioner was aware of his constitutional rights, including his right to testify at the hearing on petitioner's motion to suppress, (10) petitioner was "quite talkative," "very intelligent," experienced in the criminal justice system, and understood how the system worked, (11) petitioner never mentioned to Ugarte that petitioner was undergoing withdrawal from Klonopin or any other drug at the time of petitioner's interrogations by detective Carian, (12) the petitioner never told Ugarte that, on April 6, detective Carian ignored petitioner's repeated requests to terminate petitioner's interview and for an attorney, (13) petitioner did not tell Ugarte that petitioner began experiencing panic attacks as soon as Carian began interviewing petitioner, (14) petitioner never told Ugarte that petitioner began to tremble and shake during his first interview with Carian, (15) petitioner never told Ugarte that Carian laughed at petitioner, accused petitioner of faking illness, or threatened petitioner with the death penalty during petitioner's interviews, (16) petitioner never told Ugarte that Carian directed petitioner to conform petitioner's statement to Abdygapparova's statement or that Carian refused to arrange for petitioner to receive medical attention during the petitioner's interviews, (17) petitioner never told Ugarte that petitioner was suicidal during his interviews or that petitioner had gone without sleep for 72 hours prior to giving his statement, (18) Ugarte would have expected petitioner to convey such information to Ugarte if, in fact, it had happened because petitioner had attended college and was very good about furnishing trial counsel with information, (19) Ugarte would have objected if the prosecutor had gestured toward the victims' families during jury argument, and (20) had petitioner informed trial counsel that petitioner was withdrawing from Klonopin while giving his written statement, the whole strategy of petitioner's trial counsel at the hearing on the motion to suppress petitioner's statement would have been different.[62]

Attorney Patrick Hancock, petitioner's other trial counsel, testified in pertinent part that (1) petitioner's trial counsel obtained petitioner's medical records from the BCADC and the Center for Health Care Services, (2) Hancock asked petitioner about medications prior to the suppression hearing, (3) he did not object to prosecutorial argument concerning the wishes of the victims' families because he did not wish to make a big deal out of same, (4) Hancock spoke with petitioner regarding the circumstances surrounding petitioner giving his written statement and used that information in their motion to suppress, (5) petitioner is a very intelligent man whom Hancock believes would have been unlikely to hold anything back from trial counsel, (6) petitioner understood every aspect of trial and a lot of the nuances of court work, (7) petitioner never told Hancock that petitioner was withdrawing from Klonopin at the time petitioner gave his statement, (8) petitioner never told Hancock that petitioner was denied any medication while giving his statement, (9) petitioner never said he was experiencing a panic attack during his interrogation, (10) petitioner was "very proactive in his defense and he wasn't shy about communicating" with his trial counsel, in writing or whispering or talking during the breaks, (11) if

**62.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Michael Ugarte, at pp. 47–138.

petitioner had told Hancock that Carian had laughed at, mocked, or threatened petitioner during the interrogation, Hancock would have questioned Carian about same, (12) petitioner never indicated there was anything factually inaccurate in petitioner's written statement, (13) Hancock was aware petitioner was being treated and medicated for mental illness at the time of petitioner's arrest, (14) Hancock was unaware that petitioner was not receiving his prescribed medications at the time of petitioner's interrogation, (15) petitioner's trial counsel had their own mental health expert independently evaluate petitioner's medical records, (16) any evidence petitioner was withdrawing from drugs at the time petitioner gave his statement would have been relevant to the issue of the voluntariness of petitioner's statement and would have been helpful to the defense, and (17) petitioner never told Hancock that petitioner was suffering withdrawal symptoms or needed medication during petitioner's interrogation.[63]

### 4. Petitioner's State Appellate Counsel

The attorney who filed petitioner's appellant's brief on direct appeal testified in pertinent part that (1) he focused his review of the trial record on claims that were properly preserved, (2) he did not raise a point of error complaining about the state trial court's failure to admit Abdygapparova's written statement under the "rule of optional completeness," in part, because petitioner's trial counsel never argued for admission of her statement on that basis, (3) he also believed such a point of error lacked substantial likelihood of success because of the state harmless error rule, and

(4) he believed petitioner's trial counsel had opened the door to the questions by prosecutors directed to detective Carian which resulted in Carian explaining that petitioner refused to cooperate with investigators until Carian informed petitioner that Abdygapparova had implicated petitioner in Rosado's rape and murder.[64]

### 5. BCADC Staff

Caroline Mkubwa, a social worker at the BCADC who interviewed petitioner during the intake process, testified in pertinent part that (1) she interviewed petitioner on April 7, 2001, (2) petitioner gave a history of PTSD and anxiety and indicated he was then taking Prozac 15 mg every morning and Trazodone 50 mg, (3) petitioner denied suicidal ideation and denied a history of substance abuse, (4) petitioner was coherent, alert, oriented to time, place, and person, and displayed logical thinking with a normal neurological affect, (5) she is familiar with drug withdrawal and routinely asks inmates about their drug use and drug withdrawal, (6) petitioner did not tell her he was going through withdrawal from Klonopin, (7) she checked off a form indicating petitioner's demeanor was "normal" and "calm," and (8) had petitioner been showing signs of withdrawal distress, he would have been assigned to the detox unit but, instead, petitioner was assigned to the general population.[65]

The social worker who saw petitioner just before noon on April 7, 2001 testified in pertinent part that (1) she interviewed petitioner around 11:15 a.m. on April 7, 2001, (2) petitioner wanted medications and appeared anxious, (3) petitioner ap-

---

**63.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Patrick Hancock, at pp. 139–78.

**64.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rocky Glass, at pp. 179–213.

**65.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Caroline Mkubwa, at pp. 217–37.

peared to be anxious but coherent and oriented to time, place, and situation, (3) she checked with the nurse and learned petitioner had received Prozac or Trazodone that morning, (4) petitioner said he had been interrogated by the police for a long time, he had been silent during his interrogation, and he believed he would feel better if he got something off his chest, (5) at that point, she halted her interview and referred petitioner to the booking sergeant, (6) petitioner did not appear to be in need of immediate medical attention, (7) petitioner did not tell her he had gone without sleep for several days, (8) petitioner did not tell her he had been threatened with the death penalty and had been having panic attacks all night long, (9) petitioner did not appear suicidal, (10) petitioner did not tell her he wanted to see a doctor, (11) she is generally familiar with Klonopin, as an anti-depressant, (12) she cannot recognize Klonopin withdrawal, (13) sergeant Contreras came and took petitioner away, (14) petitioner did not become hysterical and did not demand to see a doctor, (15) petitioner was not having seizures, was not shaking or jerking uncontrollably, and was not sweating profusely, and (16) when petitioner said he wanted to get something off his chest, he did so in the context of describing his lengthy interrogation by police and she did not understand that comment to mean petitioner wanted to see a doctor.[66]

The BCADC booking sergeant whom the social worker summoned when petitioner said he wanted to get something off his chest testified in pertinent part that (1) the social worker told him petitioner wanted to get something off his chest, (2) he would not have known petitioner wished to speak with detective Carian unless peti-

tioner himself specifically identified Carian as the person with whom petitioner had already spoken, (3) if petitioner had merely requested to speak to a law enforcement officer generically, he would have referred petitioner to the Bexar County Sheriff's Department's Criminal Investigation Department, (4) he is familiar with inmates who are going through drug withdrawal, (5) petitioner did not appear to be showing symptoms of drug withdrawal, (6) he routinely refers inmates going through drug withdrawal or experiencing medical problems to the BCADC medical staff or a social worker, (7) he would not have told an inmate going through withdrawal to talk with an investigator, and (8) "I want to get something off my chest" is a common expression used by inmates who wish to make a confession.[67]

### 6. The Interviewing Detectives

Detective John Kellogg testified, in pertinent part that (1) after interviewing Asel Abdygapparova, he obtained an arrest warrant for petitioner, (2) when he saw petitioner shortly after petitioner's arrest, petitioner did not appear to be having a panic attack and did not appear to be in need of medical attention, (3) petitioner did not appear to be experiencing convulsions or seizures or any involuntary muscle movement, (4) petitioner did not mention medications, (5) he did not see detective Carian laugh at, mock, or threaten petitioner with the death penalty, (6) he did not see detective Carian accuse petitioner of faking any symptoms of a medical problem, (7) he did not witness petitioner invoke his right to counsel within the first few minutes of the April 6, 2001 interview, (8) neither he nor detective Carian ever

**66.** S.F. State Habeas Hearing, Volume 5 of 10, testimony of Kim Robinson, at pp. 3–46.

**67.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rogelio M. Contreras, at pp. 238–52.

refused any request by petitioner for medical attention, (9) he was not present when petitioner invoked his right to counsel (Kellogg left the interview around 3:30 a.m. on April 6, 2001), (10) neither he nor detective Carian suggested they had the authority to withhold medical treatment or medication from petitioner, (11) petitioner never mentioned Klonopin in his presence, (12) petitioner never indicated he was going through withdrawal from any drug, (13) petitioner did not appear to be shaking, sweating profusely, or exhibiting any other sign or symptom of a need for medical attention, (14) he did not recall detective Carian ever telling petitioner that the information contained in Abdygapparova's statement was what the petitioner should put into his own statement, (15) following a trip to Austin on April 7, 2001, he and detective Carian met again with petitioner at the BCADC, (16) when they met again on the afternoon of April 7, 2001, petitioner did not appear surprised to see them, (17) petitioner did not express a desire to see a physician, (18) petitioner was not trembling, suicidal, or any more anxious that other suspects, and (19) petitioner did not appear to be in need of medical attention on April 7, 2001.[68]

Detective Andrew B. Carian testified in pertinent part that (1) Abdygapparova led police to the location of Rosado's body, (2) he obtained an arrest warrant for petitioner, (3) his first contact with petitioner came on April 6 after petitioner's arrest when he (Carian) read petitioner his rights, (4) Carian advised petitioner that Abdygapparova had implicated petitioner in a murder, (5) petitioner did not appear to be having a panic attack, (6) petitioner had a very serious demeanor and showed no sign he lacked comprehension, (7) petitioner was able to communicate clearly and appeared to understand what Carian said,

(8) petitioner's arms and legs were not jerking involuntarily, (9) petitioner did not appear to be having a seizure and was not sweating profusely, (10) petitioner never mentioned that he needed any medications or any medicine at all, (11) Carian did not laugh at, mock, or accuse petitioner of faking any symptoms of a medical problem, (12) Carian never suggested he had the authority to withhold medications from petitioner, (13) petitioner did not invoke his right to counsel or ask to terminate the interview at the outset or within five minutes of the start of that interview, (14) petitioner did not repeatedly request an attorney, (15) initially, petitioner denied knowing either Minjarez or Abdygapparova and claimed to be unable to identify a photo of Minjarez, (16) eventually, after more than two hours of discussion during which petitioner made it clear he did not wish to give a formal statement, petitioner did invoke his right to counsel and petitioner's interview immediately halted on that date, (17) at that time (around 5 a.m. on April 6), Carian turned petitioner over to a patrol officer for transport to the Magistrate's office, (18) petitioner never mentioned Klonopin to Carian, (19) petitioner exhibited no signs on April 6 that petitioner needed medicine or medical attention, (20) while in Austin on April 7, Carian received a page from detective Whitson indicating petitioner wanted to talk with Carian, (21) Carian and detective Kellogg went to see petitioner at the BCADC, (22) petitioner did not appear surprised to see them, (23) Carian again gave petitioner his *Miranda* warnings, informed petitioner that Carian had received a message that petitioner wanted to talk, and asked "What's up?", (24) petitioner did not ask for a doctor, (25) at that point, petitioner started discussing his case, specifically, blaming Minjarez for Rosado's

---

68. S.F. State Habeas Hearing, Volume 5 of 10, testimony of John Kellogg, at pp. 47–83.

death, (26) Carian asked petitioner if he would agree to be transported to the Homicide Office to give a statement and petitioner consented, (27) once they all arrived at the Homicide Office, petitioner gave a written statement outlining petitioner's role in the offense, (28) Carian did not suggest to petitioner what information petitioner should include in petitioner's statement, (29) petitioner did not appear to be having a panic attack, (30) throughout that interview on April 7, petitioner did not mention any need for medication and did not request to see a physician, (31) Carian did not laugh at or accuse petitioner of faking any symptoms of any medical condition, (32) Carian did not threaten petitioner with the death penalty if petitioner failed to cooperate, (33) Carian did not withhold any medication or threaten to withhold any medication from petitioner, (34) petitioner never mentioned Klonopin to Carian, (35) petitioner was not sweating profusely, shaking, having a seizure, or exhibiting involuntary twitching of his arms or legs, (36) Carian typed petitioner's statement on a computer and then petitioner spent at least three hours carefully editing the nine-page statement, (37) petitioner made several corrections to the initial draft of his statement and even made a few changes to the final draft, (38) two civilians witnessed petitioner's execution of his written statement, (39) petitioner never mentioned medicine prior to the execution of his statement, (40) at the time petitioner requested an attorney on April 6, everything stopped, (41) during both interviews,

Carian was unaware that petitioner had been under the care of a psychiatrist while on parole or that petitioner was taking prescribed medications, and (42) Carian had no reason to suspect that was the case.[69]

### 7. *Oral Argument*

On March 20, 2008, the state habeas trial court heard final oral argument in petitioner's state habeas corpus proceeding. During petitioner's argument, his state habeas counsel emphasized that resolution of petitioner's complaint about the admission of his allegedly involuntary confession turned on a credibility determination in which the court had to weigh the relative credibility of petitioner's account of his interview with that of detectives Carian and Kellogg.[70]

### 8. *Findings and Conclusions*

In an Order issued March 31, 2008, the state habeas trial judge issued her findings of fact and conclusions of law recommending denial of petitioner's state habeas corpus application.[71] For unknown reasons, on July 8, 2008, the state habeas trial court issued a second, virtually identical, order setting forth its findings of fact, conclusions or law, and recommendation that petitioner's state habeas corpus application be denied.[72]

In pertinent part, the state habeas trial court found (1) petitioner's assertion that he supplemented his own Klonopin prescription with medicine he obtained from his uncle was not credible,[73] (2) petitioner's

**69.** S.F. State Habeas Hearing, Volume 5 of 10, testimony of Andrew B. Carian, at pp. 84–133.

**70.** S.F. State Habeas Hearing, verbatim transcript of oral argument held March 20, 2008, Volume 1 of 1, at pp. 3–16, 30–45.

**71.** State Habeas Transcript, Volume II, at pp. 365–436.

**72.** State Habeas Transcript, Volume III, at pp. 30–101.

**73.** State Habeas Transcript, Volume II, at p. 421; State Habeas Transcript, Volume III, at p. 86.

assertions in his affidavit and testimony regarding his interview on April 6, 2001 were not credible and the testimony of detectives Kellogg and Carian concerning the petitioner's interview on April 6, 2001 was credible,[74] (3) petitioner's assertions that he became hysterical, demanded Kim Robinson call a doctor right away, and that Sergeant Contreras told petitioner "you need to talk to an investigator, not a doctor" were not credible,[75] (4) the testimony of Caroline Mkubwa, Kim Robinson, and Rogelio Contreras was credible and established that petitioner's testimony concerning his condition while at the BCADC on April 7, 2001 was false,[76] (5) the testimony of John Kellogg and Andrew Carian concerning petitioner's condition during his interview on April 7, 2001 was credible and established that petitioner's assertions that his will was overborne and his written statement was involuntary were false,[77] and (6) petitioner's assertions that he was suffering from withdrawal symptoms on April 6–7, 2001 were not credible.[78]

Based on the foregoing factual findings, the state habeas trial court concluded, in pertinent part, that (1) petitioner's written statement to police was freely and voluntarily given,[79] (2) police scrupulously honored petitioner's invocation of his right to counsel and to terminate his interview and spoke with petitioner again only because petitioner asked them to come back and talk with him,[80] (3) the officers first reminded petitioner of his rights before re-initiating contact with him,[81] and (4) petitioner's trial counsel were both constitutionally effective.[82]

### 9. Texas Court of Criminal Appeals' Ruling

In an unpublished, per curiam, order issued September 10, 2008, the Texas Court of Criminal Appeals adopted the findings and conclusions of law issued by the state trial judge with the exception of the trial court's findings and conclusions regarding petitioner's final claim, i.e., petitioner's complaint that his state appellate counsel failed to raise a point of error protesting the state trial court's failure to permit petitioner's trial counsel to introduce the contents of Abdygapparova's statement.[83]

---

**74.** State Habeas Transcript, Volume II, at p. 422; State Habeas Transcript, Volume III, at p. 87.

**75.** State Habeas Transcript, Volume II, at pp. 422–23; State Habeas Transcript, Volume II, at pp. 87–88.

**76.** State Habeas Transcript, Volume II, at p. 423; State Habeas Transcript, Volume III, at p. 88.

**77.** State Habeas Transcript, Volume II, at pp. 423–24; State Habeas Transcript, Volume III, at p. 88.

**78.** State Habeas Transcript, Volume II, at p. 424; State Habeas Transcript, Volume III, at p. 89.

**79.** State Habeas Transcript, Volume II, at p. 424; State Habeas Transcript, Volume III, at p. 89.

**80.** State Habeas Transcript, Volume II, at p. 424; State Habeas Transcript, Volume III, at p. 89.

**81.** State Habeas Transcript, Volume II, at p. 424; State Habeas Transcript, Volume III, at p. 89.

**82.** State Habeas Transcript, Volume II, at pp. 424–25; State Habeas Transcript, Volume III, at p. 89.

**83.** The Texas Court of Criminal Appeals' per curiam order of September 10, 2008 reads as follows:

This Court has reviewed the record with respect to the allegations made by applicant. We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions with the following exception: Findings of Fact and Conclusions of Law on Applicant's Ground for Review (1). Based

M. *Procedural History in this Court*

On May 15, 2009, petitioner filed his petition for federal habeas corpus relief in this Court, urging six claims for relief. *Docket entry no. 11.*

On October 14, 2009, respondent filed his answer. *Docket entry no. 25.*

On December 3, 2009, petitioner filed his reply to respondent's answer. *Docket entry no. 28.*

## II. *AEDPA Standard of Review*

■ Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

■ The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122

S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton,* 544 U.S. at 141, 125 S.Ct. at 1439; *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively un-

---

upon the trial judge's findings and conclusions and our own review of the record, relief

is denied.

reasonable." *McDaniel v. Brown,* —— U.S. ——, ——, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.' "); *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan,* 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

■ Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

■ The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen,* —— U.S. ——, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor,* 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen,* —— U.S. at ——, 130 S.Ct. at 849; *Rice v. Collins,* 546 U.S. 333, 341–42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

■ In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan,* 550 U.S. at 473–74, 127 S.Ct. at 1939–40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' "); *Rice v. Collins,* 546 U.S. 333, 338–39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' "); *Miller–El v. Dretke,* 545 U.S. 231, 240, 125

S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness by clear and convincing evidence.' "); 28 U.S.C. § 2254(e)(1). It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen,* —— U.S. at ——, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins,* 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

■ However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller–El v. Dretke,* 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

■ Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 550 U.S. 921, 127 S.Ct. 2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006) (holding the same), *cert. denied,* 550 U.S. 920, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc*) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. Involuntary Confession & Involuntary Waiver Claims

#### A. The Claims

In his first two claims for federal habeas corpus relief, the petitioner argues (1) his due process rights were violated by virtue of the admission of his allegedly involuntary written statement and (2) his written statement was inadmissible, in part, because his waiver of his rights to counsel and not to incriminate himself was involuntary.[84]

---

**84.** Petitioner's Petition for Writ of Habeas Corpus, filed May 15, 2009, docket entry no. 11 (henceforth "Petition"), at pp. 4–5; Petitioner's Brief in Support of Petition for Writ of Habeas Corpus, filed May 15, 2009, docket entry no. 12 (henceforth Petitioner's Brief), at pp. 2–21.

## B. State Court Disposition

Petitioner complained in his third point of error on direct appeal that the trial court erred when it failed to suppress his oral and written statements and allowed the prosecution to elicit testimony regarding same.[85] In its unpublished opinion affirming petitioner's conviction and death sentence, the Texas Court of Criminal Appeals concluded as follows:

> In his third point of error, Hernandez argues that the trial court erred in failing to suppress his oral and written statements, that the trial court erred in allowing the State to elicit testimony regarding Hernandez's written statement, and that Article 38.22 was violated when the trial court failed to make findings of fact regarding the voluntariness of his statement. Hernandez fails to apply the law to the facts in this case with respect to all three of his allegations. He simply makes bare assertions. We will not address this point of error because it is multifarious and inadequately briefed. Hernandez's third point of error is overruled.[86]

Petitioner re-urged his complaints about the admission of his allegedly involuntary statement and his allegedly involuntary waiver of his Fifth and Sixth Amendment rights as his third, fourth, and fifth claims for state habeas corpus relief.[87] The state habeas trial court held that, insofar as petitioner sought to re-litigate the voluntariness of his confession through the introduction of evidence that was available at the time of petitioner's pretrial motion to suppress hearing, petitioner waived those complaints.[88] As was explained at length above, the state habeas trial court held a lengthy evidentiary hearing on petitioner's involuntariness claims, heard testimony from a plethora of witnesses, found petitioner's accounts of his alleged Klonopin withdrawal and allegedly "involuntary" confession to be wholly incredible, and rejected petitioner's involuntariness claims on the merits.[89] The Texas Court of Criminal Appeals adopted this aspect of the state habeas trial court's findings and conclusions and rejected relief on the merits. *Ex parte Ramon Hernandez*, WR–69,724–01, 2008 WL 4151799 (Tex.Crim.App. September 10, 2008).

## C. Clearly Established Federal Law

"Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). "[C]oercive police ac-

---

**85.** *Appellant's Brief*, filed December 19, 2003, at pp. 23–25.

**86.** *Hernandez v. State*, AP–74,451 (Tex.Crim. App. March 23, 2005), at p. 8.

**87.** State Habeas Transcript, Volume I, at pp. 38–57.

**88.** As the state habeas trial court noted, ordinarily, under Texas law a claim raised and rejected on direct appeal is not cognizable in a state habeas corpus proceeding. *Ex parte Reynoso*, 257 S.W.3d 715, 723 (Tex.Crim.App. 2008); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex.Crim.App.1997). Nonetheless, because petitioner also re-urged his involuntariness claims in conjunction with a complaint about the performance of petitioner's trial counsel during the pretrial hearing on defendant's motion to suppress, the state habeas trial court effectively permitted petitioner to re-litigate the merits of petitioner's motion to suppress based upon evidence that was never presented during petitioner's pretrial motion-to-suppress hearing. State Habeas Transcript, Volume II, at pp. 397–98; State Habeas Transcript, Volume III, at pp. 62–63.

**89.** State Habeas Transcript, Volume II, at pp. 405–24; State Habeas Transcript, Volume III, at pp. 70–89.

tivity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. at 522. "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir.), *cert. denied*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003).

 The voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). When an accused has invoked his right to counsel during custodial interrogation, as did petitioner on April 6, 2001, a valid waiver of *Miranda* rights cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his right; rather, an accused, such as petitioner, having expressed a desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a

matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. at 482, 101 S.Ct. at 1884.

### D. Synthesis

Under the AEDPA's deferential standard of review, this Court's role is limited to determining whether a state court's decision on a matter of federal constitutional law (i.e., whether the defendant's federal constitutional rights were violated) was either (1) contrary to, or involved an unreasonable application of, clearly established federal law or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Williams v. Taylor*, 529 U.S. at 404–05, 120 S.Ct. at 1519; 28 U.S.C. § 2254(d).

The initial problem with analyzing petitioner's first and second claims herein is that petitioner's pleadings herein are ambiguous with regard to precisely which state court ruling petitioner is challenging herein.

### 1. Original Denial of Motion to Suppress was Reasonable

 Insofar as petitioner argues the state trial court erred when it failed to suppress petitioner's written statement, the proper focus of AEDPA analysis is on the evidence and arguments before the state trial court when it made the ruling in question, i.e., at the March 20, 2002 hearing on petitioner's motion to suppress.[90]

---

**90.** On direct appeal, the Texas Court of Criminal Appeals rejected petitioner's third point of error for reasons wholly separate and distinct from the lack of merit in that point of error. Thus, until the state habeas court

ruled on petitioner's involuntariness claims many years later, the only state court to have addressed the merits of petitioner's claims that (1) his confession was involuntary and (2) his waiver of his Fifth and Sixth Amendment

Insofar as petitioner's third, fourth, and fifth claims herein challenge the state trial court's overruling of petitioner's motion to suppress in March, 2002, this Court must determine whether that ruling was objectively reasonable given then-clearly-established federal law and the evidence then-before the state trial court. The evidence and arguments presented many years later during the petitioner's state habeas corpus proceeding cannot logically or legally render unreasonable a determination that was objectively reasonable at the time it was originally made. Simply put, insofar as petitioner challenges the state trial court's original ruling denying his motion to suppress, this Court's analysis of whether petitioner's written confession was voluntary and whether petitioner's waiver of his Fifth and Sixth Amendment rights on April 7, 2001 was voluntary focuses on the evidence presented to the state trial court when it denied petitioner's motion to suppress, not on the evidence presented years later in connection with petitioner's analytically distinct complaints about the performance of his trial counsel during the hearing on his motion to suppress.

The evidence and arguments presented during petitioner's state habeas corpus proceeding may have been relevant to petitioner's complaints about the performance of his trial counsel during the original motion to suppress hearing but the petitioner's testimony (and the rest of the ex post

facto testimony regarding the circumstances surrounding petitioner's April 7, 2001 confession) presented during the petitioner's state habeas corpus hearing in October, 2007 are not determinative of whether the state trial court's original ruling on petitioner's motion to suppress was objectively reasonable in light of clearly established federal law and the evidence then before that court. Petitioner's state habeas counsel did an excellent job confusing the state habeas court to the point that it undertook a wholly unnecessary re-trial of the issues originally resolved during petitioner's motion to suppress hearing.[91]

As was explained in detail in Section I.G. above,[92] during the petitioner's motion to suppress hearing on March 20, 2002, detective Carian testified *without contradiction* that (1) the petitioner invoked his right to counsel on April 6, 2001, at which time Carian's interview with petitioner promptly terminated, (2) petitioner initiated the contact between them on April 7, 2001, (3) he gave petitioner a second set of Miranda warnings at the outset of their meeting on April 7, 2001, (4) petitioner thereafter began talking about Rosado's murder and agreed to accompany detectives Carian and Kellogg to the police homicide office to give a statement, (5) he made no threats or promises to induce petitioner's statement, (6) petitioner indicated he understood his rights and wished

---

rights was involuntary was the state trial court.

**91.** Petitioner's state habeas corpus application lumped together petitioner's complaints that (1) his written statement was involuntary, (2) his waiver of his Fifth Amendment right not to incriminate himself was violated, (3) his Sixth Amendment right to the assistance of counsel during a custodial interrogation was violated, and (4) his trial counsel rendered ineffective assistance in connection with petitioner's motion to suppress hearing. State Habeas Transcript, Volume I, at pp. 38–

57. At oral argument before the state habeas court, petitioner's state habeas counsel argued the voluntariness of petitioner's written confession turned on the state habeas court's resolution of the diametrically opposing versions of petitioner's April 7, 2001 interrogation given by petitioner, on the one hand, and Detective Carian, on the other. S.F. State Habeas Oral Argument, Volume 1 of 1, March 20, 2008, at pp. 4, 36.

**92.** *See notes 24–27, supra, and accompany text.*

to tell his side of the story, (7) he furnished petitioner with drinks and snacks during their April 7, 2001 interview, (8) petitioner had bathroom breaks during their interview, and (9) he was unaware petitioner was then taking any prescribed medications for depression or any other mental illness.[93] BCADC social worker Kim Robinson testified during the same hearing *without contradiction* that, when the petitioner informed her on April 7, 2001 that "he wanted to get something off his chest," she immediately referred him to the booking sergeant.[94]

In light of the foregoing uncontradicted testimony, this Court concludes the state trial court's original overruling of petitioner's motion to suppress was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's motion-to-suppress hearing. On the contrary, the state trial court's rejection of petitioner's original motion to suppress appears to be fully consistent with the principles set forth in *Colorado v. Connelly, supra*, and *Edwards v. Arizona, supra.*

The state trial court reasonably concluded the uncontradicted testimony of detective Carian at the pretrial hearing on petitioner's motion to suppress established there was no coercion directed against petitioner on April 7, 2001 to induce petitioner to give his written statement. Thus, under the legal standard set forth in *Con-*

*nelly,* petitioner's written statement was voluntary. According to detective Carian's uncontradicted account, petitioner spent many hours on April 1, 2001 furnishing police with a highly detailed account of the events surrounding Rosado's abduction, robbery, sexual assault, and murder. Again, based on Carian's uncontradicted testimony at the hearing on petitioner's motion to suppress, petitioner edited his statement with great care. Kim Robinson's uncontradicted testimony established how petitioner re-initiated conversations with the police on April 7, 2001. Detective Carian's uncontradicted testimony during the pretrial hearing on petitioner's motion to suppress established the petitioner voluntarily, intelligently, and knowingly waived his Fifth and Sixth Amendment rights. *See Moran v. Burbine,* 475 U.S. 412, 422–23, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."); *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) ("in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.").[95]

### 2. State Habeas Court's Rulings were Reasonable

Insofar as petitioner's first and second claims herein challenge the state habeas

---

**93.** S.F. Trial, Volume 2, testimony of Andrew B. Carian, at pp. 26–59.

**94.** S.F. Trial, Volume 2, testimony of Kim Robinson, at pp. 4–17.

**95.** Although not controlling for purposes of this Court's retrospective AEDPA analysis, the Supreme Court's recent opinion in *Berghuis v.*

*Thompkins,* —— U.S. ——, ——, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010), does not appear to require a different result. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.*

court's rejections on the merits of petitioner's involuntariness claims, this Court must focus on the evidence presented during petitioner's state habeas corpus proceeding in October, 2007, summarized above in Section I.L.[96]

This Court concludes (1) the state habeas court's credibility findings, i.e., those findings explicitly or implicitly rejecting the factual accuracy of petitioner's testimony and, instead, finding credible the testimony of numerous BCADC employees, detectives Carian and Kellogg, and petitioner's own trial counsel, are eminently reasonable in light of the evidence presented before the state habeas trial court in October, 2007 and (2) the state habeas court's rejections on the merits of petitioner's complaints about the alleged involuntariness of his written statement and his waiver of his Fifth and Sixth Amendment rights were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Having independently review the entire record from petitioner's state habeas corpus proceeding, including the more than one thousand pages of medical records admitted as exhibits during petitioner's state habeas corpus hearing in October, 2007, this Court finds wholly reasonable the state habeas corpus court's factual findings which rejected as incredible petitioner's highly dubious account of the extreme withdrawal symptoms petitioner claimed to have experienced during the April 6–7, 2001 time frame. As the state habeas court correctly noted, petitioner's own treating physician, Dr. Robert Stowe, testified without contradiction during petitioner's state habeas corpus hearing that petitioner's vital signs taken on April 7, 2001 at approximately 11:58 a.m. were all in or near the normal range and did not indicate petitioner was then suffering the effects of Klonopin withdrawal.[97] Dr. Stowe also testified, in pertinent part that (1) petitioner never indicated to Dr. Stowe that petitioner was taking more than the prescribed dosage of Klonopin, (2) petitioner on one occasions indicated to Dr. Stowe that he (petitioner) was only taking Klonopin on an "as needed" basis, (3) he believed the dosage of Prozac he prescribed for petitioner was sufficient to handle petitioner's anxiety symptoms, (4) he slowly tapered petitioner off Klonopin and discontinued petitioner's Klonopin prescription completely in February, 2001, (5) anyone experiencing Klonopin withdrawal from four milligrams daily to none, as petitioner testified he was experiencing on April 6–7, 2001, could be expected to exhibit anxiety, convulsions, tremors, increased blood pressure, increased heart rate, sweating, agitation, and increased motor restlessness, (6) petitioner never resisted Dr. Stowe's efforts to reduce petitioner's Klonopin dosage, (7) if petitioner had gone "cold turkey" off Klonopin in the manner petitioner testified, it would be unlikely petitioner would not experience at least some withdrawal symptoms, and (8) *petitioner's vital signs on April 7, 2001 were not indicative of a person then experiencing Klonopin withdrawal.*[98]

**96.** *See notes 56–69, supra, and accompanying text.*

**97.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at pp. 35–38.

**98.** *Id.,* at pp. 12–20, 24–42.

Furthermore, as was explained at length in Section I.L. above, with the exception of petitioner, none of the persons who testified during the petitioner's state habeas corpus hearing who personally observed petitioner during the April 6–7, 2001 time frame claimed to have witnessed petitioner displaying any of the significant physiological indications of Klonopin withdrawal described by either Dr. Stowe or Dr. Lundberg–Love during their testimony which petitioner claimed to then-be experiencing.[99]

The one fact petitioner and both his trial counsel agreed upon during their testimony before the state habeas court was that petitioner never informed his trial counsel that he had undergone Klonopin withdrawal on April 6–7, 2001.[100] In fact, petitioner's experienced trial counsel testified they would have considered any evidence suggesting petitioner was withdrawing from Klonopin on April 6–7, 2001 as directly relevant to the issue of the voluntariness of petitioner's written statement (which they vigorously contested) and, had they received such information, it would have changed their strategy at the motion to suppress hearing.[101] Like the state habeas court, this Court finds it wholly implausible that an experienced, college-educated, career criminal such as petitioner would have withheld from his own trial counsel any mention of the allegedly severe withdrawal symptoms petitioner testified in October, 2007 he had experienced in April, 2001. Given the testimony of petitioner's experienced trial counsel and petitioner's obvious familiarity with the criminal justice system, the state habeas court reasonably found petitioner was well aware of his right to testify during the pretrial hearing on petitioner's motion to suppress in March, 2002, by which time petitioner admitted he had been receiving Klonopin from BCADC medical staff for months.[102]

Finally, petitioner admitted during his testimony at his state habeas corpus hearing that, on the afternoon of April 7, 2001 (after petitioner had received his prescribed dosage of Prozac), he furnished detective Carian with a highly detailed written statement which petitioner meticulously edited (over a total of approximately eight hours) and which petitioner claimed was factually accurate in all regards.[103]

**99.** Petitioner claimed that, during his interviews with detective Carian on April 6 and April 7, 2001, petitioner experienced trembling and shaking, a panicky sensation, feelings of impending doom, difficulty breathing, involuntary jerking of his limbs, sweating, profusely, feelings of disorientation and confusion, the sensation of blood rushing through his head, nervousness, his knees shaking, tension, hyperventilation, his heart racing, feeling "unbalanced," exhaustion, and the effects of prolonged insomnia. S.P. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 30, 61, 67–69, 181–87, 214–15.

**100.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 28, 32–37, 270–72, 275, 278, 292–94, 296; Volume 4 of 10, testimony of Michael Ugarte, at pp. 54–56, 61–71, 73–77, 79–80, 82, 86, 103–04, 116–17, 119–21, 137–38; testimony of

Patrick Hancock, at pp. 143–45, 157–65, 168, 175, 177–78.

**101.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Michael Ugarte, at pp. 51, 54–56, 61–71, 73–77, 103–04, 116–17, 119–21; Testimony of Patrick Hancock, at pp. 143–45, 157, 160–63, 165, 169, 175, 177–78.

**102.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 32, 258–60, 270–71, 279–80.

Petitioner explained he specifically requested Klonopin after his arrest and was able to obtain it from BCADC medical personnel because "they will give you what you need in order to keep—keep us calm here." *Id.*, at pp. 259–60.

**103.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp.

The testimony presented during petitioner's state habeas corpus hearing fully supports the state habeas court's conclusions that petitioner's written statement was voluntary and the petitioner's waiver of his Fifth and Sixth Amendment rights was voluntary, intelligent, and knowing. *See Moran v. Burbine,* 475 U.S. at 422–23, 106 S.Ct. at 1141 ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.")

### 3. *No Basis for Relief under de novo Review*

Alternatively, in the event an appellate court one day concludes this Court should have conducted a de novo review of petitioner's complaints about the alleged involuntariness of his written confession and the alleged involuntariness of his waiver of his Fifth and Sixth Amendment rights, this Court concludes (1) petitioner's complaint about the alleged involuntariness of his written statement lacks any arguable merit and (2) petitioner's complaint about the alleged involuntariness of his waiver of his Fifth and Sixth Amendment rights lacks any arguable merit. In light of the objective evidence showing petitioner's vital signs were in or near the normal range on the morning of April 7, 2001 [104] and petitioner's admission that he received his prescribed dosage of Prozac that same morning,[105] there is no credible evidence in the record establishing petitioner's highly de-

tailed written confession was involuntary or the result of an involuntary waiver of his Fifth or Sixth Amendment rights. Petitioner knew full well on April 7, 2001 how to terminate an interview with police had he wished to do so when he met with detectives Carian and Kellogg. In point of fact, he had done precisely that on April 6, 2001. Under the facts as found by the state habeas court, which after independent review this Court finds eminently reasonably, petitioner's waiver of his Fifth and Sixth Amendment rights was voluntary, intelligent, and knowing and his confession uncoerced. *See Berghuis v. Thompkins,* —— U.S. ——, ——, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (2010) ("a suspect who has received and understood his *Miranda* warnings, and had not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police.").

### E. *Conclusions*

The state trial court's rejections on the merits in March, 2002 of petitioner's claims that his written confession was involuntary and that his waiver of his Fifth and Sixth Amendment rights was involuntary were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's motion-to-suppress hearing.

The state habeas court's rejections on the merits of petitioner's state habeas claims that his written confession was in-

---

192, 202–03, 205, 221, 223, 225–26, 230, 233–38, 241, 244, 258–59, 287–88.

**104.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at pp. 35–38.

**105.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 241, 259.

voluntary and that his waiver of his Fifth and Sixth Amendment rights was involuntary were neither *contrary to,* nor involved an *unreasonable application of,* clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Alternatively, this Court independently concludes petitioner's first and second claims herein lack any arguable merit because, like the state habeas court, this Court finds petitioner's allegations that he was experiencing severe Klonopin withdrawal on April 6–7, 2001 were completely refuted by the evidence establishing (1) petitioner's vital signs on the morning of April 7, 2001 were all in or near the normal range,[106] (2) the petitioner is very experienced in the criminal justice system, highly intelligent, and yet he utterly failed to inform his own trial counsel about the alleged Klonopin withdrawal petitioner claimed to have experienced on April 6–7, 2001,[107] (3) petitioner was able, despite his alleged withdrawal symptoms, over the course of many hours to furnish and carefully edit a highly detailed written statement on April 7, 2001,[108] and (4) no one who observed petitioner on April 6–7, 2001 witnessed petitioner exhibiting any of the severe physiological symptoms petitioner claimed to be experiencing at that time.[109] Accordingly, petitioner's first two claims herein do not warrant federal habeas corpus relief.

## IV. *Ineffective Assistance by Trial Counsel*

### A. *The Claims*

In his third, fourth, and fifth claims herein, petitioner argues his trial counsel rendered ineffective assistance by failing to (1) introduce all available evidence at the hearing on petitioner's motion to suppress showing petitioner's written statement was involuntary (specifically petitioner's testimony and medical records and the testimony of petitioner's medical and mental health experts presented during petitioner's state habeas corpus proceeding), (2) exclude or prevent the admission of evidence relating to the murders of Sarah Gonzales and Priscilla Almares, and (3) object to the prosecution's closing argument at the punishment phase of trial regarding the victims' families' feelings about the appropriate punishment.[110]

---

106. S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at pp. 35–38.

107. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 32-37; Volume 4 of 10, testimony of Michael Ugarte, at pp. 54-56, 61-65, 73-77; Volume 4 of 10, testimony of Patrick Hancock, at pp. 143-45, 158-65, 169, 175, 177-78.

108. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 221, 223, 225–26, 230, 233–34, 237–38, 251, 287–88.

109. As was explained in detail in Section I.L. above, none of the BCADC employees nor any of the San Antonio Police detectives who testified during petitioner's state habeas corpus hearing (who encountered petitioner on April 6–7, 2001) observed anything about petitioner's appearance or demeanor that suggested to them petitioner was either suicidal, suffering from the effects of drug withdrawal, or otherwise in need of immediate medical attention.

110. Petition, at p. 5; Brief in Support of Petition, at pp. 2–36. As was explained above, petitioner lumped his initial complaint of ineffective assistance in with his involuntariness complaints in a successful effort to lure the state habeas court into re-litigating the propriety of the trial court's denial of petitioner's motion-to-suppress based upon evidence *that was never presented to the state trial court during the original hearing on petitioner's motion to suppress.*

## B. *The Constitutional Standard*

The constitutional standard for reviewing petitioner's complaints about the performance of his trial counsel is well–settled. The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.,* legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes,* —— U.S. ——, ——, 130 S.Ct. 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook,* —— U.S. ——, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum,* —— U.S. ——, ——, 130 S.Ct. 447, 452–53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 386).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland,* i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook,* —— U.S. at ——, 130 S.Ct. at 16; *Strickland v. Washington,* 466 U.S. at 688–89, 104 S.Ct. at 2065. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

■ In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 386; *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 390–91.

■ A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman,* 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman,* 543 F.3d 230, 235 (5th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000), *cert. denied,* 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman,* 482 F.3d 815, 820 (5th Cir.2007); *Sonnier v. Quarterman,* 476 F.3d 349, 356 (5th Cir. 2007), *cert. denied,* 552 U.S. 948, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman,* 458 F.3d at 410; *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied,* 549 U.S. 1323, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007).

### C. *Failure to Present Available Evidence at Pretrial Hearing on Motion to Suppress*

#### 1. *The Claim*

In his third claim herein, petitioner argues his trial counsel should have presented petitioner's testimony, petitioner's medical records, and the testimony of medical and mental health experts like Dr. Stowe and Dr. Lundberg–Love, respectively, during petitioner's pretrial hearing on defendant's motion to suppress petitioner's written statement.[111]

#### 2. *State Court Disposition*

The state habeas trial court expressly found that (1) the petitioner never told his trial counsel that "at the time of his interrogation, he was going through withdrawal from a drug called Klonopin or from any other drug,"[112] (2) the petitioner did not tell his trial counsel that "during his interrogation by police he was in need of medi-

---

**111.** Brief in Support of Petition, at pp. 2–21.

**112.** State Habeas Transcript, Volume II, at p. 419; State Habeas Transcript, Volume III, at p. 84.

cal attention or that he was being denied medical attention by the police," [113] (3) the petitioner did not tell his trial counsel that during his interviews with Carian, petitioner experienced panic attacks or began shaking uncontrollably,[114] (4) the petitioner never told his trial counsel that Carian ignored petitioner's repeated requests to terminate the interview or for an attorney, laughed at petitioner, accused petitioner of faking the episodes, threatened petitioner with the death penalty, or refused to arrange for the administration of any medications unless petitioner agreed to give a statement,[115] (5) the testimony of detectives Carian and Kellogg regarding petitioner's April 6, 2001 interrogation was credible,[116] (6) the testimony of Caroline Mkubwa, Kim Robinson, Rogelio Contreras, John Kellogg, and Andrew Carian regarding petitioner's appearance and conduct on April 7, 2001 was credible and petitioner's very dissimilar accounts of same were incredible,[117] and (7) the petitioner was not suffering from withdrawal symptoms on April 6–7, 2001.[118]

The state habeas trial court expressly concluded that (1) petitioner's written statement was freely and voluntarily given, (2) petitioner's statement was the product of no police misconduct but, rather, petitioner's choice to give the police his own version of the facts surrounding Rosado's

capital murder, (3) the only reason police spoke with petitioner again on April 7, 2001 was petitioner's request that they do so, (4) petitioner was reminded of his rights prior to this second interview, and (5) petitioner's complaints about his trial counsel's performance in connection with petitioner's pretrial motion to suppress hearing did not satisfy either prong of the *Strickland* test.[119]

The Texas Court of Criminal Appeals adopted these findings and conclusions when it rejected petitioner's ineffective assistance claims on the merits in the course of petitioner's state habeas corpus proceeding.

### 3. *Synthesis*

#### a. *No Deficient Performance*

 The fundamental problem with this assertion of ineffective assistance is that it is premised upon petitioner's contention that, throughout his interrogations on April 6–7, 2001, he was experiencing severe withdrawal symptoms from the prescription medication Klonopin, a contention which the state habeas court reasonably found to be incredible.[120] The state habeas trial court reasonably concluded petitioner's testimony suggesting he was experiencing severe withdrawal symptoms during his police interviews on

**113.** State Habeas Transcript, Volume II, at pp. 419–20; State Habeas Transcript, Volume III, at p. 84.

**114.** State Habeas Transcript, Volume II, at p. 420; State Habeas Transcript, Volume III, at pp. 84–85.

**115.** State Habeas Transcript, Volume II, at p. 420; State Habeas Transcript, Volume III, at p. 85.

**116.** State Habeas Transcript, Volume II, at p. 422; State Habeas Transcript, Volume III, at p. 87.

**117.** State Habeas Transcript, Volume II, at pp. 423–24; State Habeas Transcript, Volume III, at p. 88.

**118.** State Habeas Transcript, Volume II, at p. 424; State Habeas Transcript, Volume III, at p. 88.

**119.** State Habeas Transcript, Volume II, at pp. 424–25; State Habeas Transcript, Volume III, at p. 89.

**120.** State Habeas Transcript, Volume II, at pp. 424–25; State Habeas Transcript, Volume III, at p. 89.

those dates was incredible. Having independently reviewed the entirety of the voluminous record from petitioner's state habeas corpus proceeding, this Court concludes the state habeas court's credibility findings were eminently reasonable. Dr. Stowe's testimony established that any person suffering the type of severe withdrawal symptoms petitioner described should have exhibited objectively verifiable indications of withdrawal, including elevated blood pressure and heart rate. Yet petitioner's "normal" vital signs taken shortly before noon on April 7, 2001 belie any contention petitioner was then experiencing the type of severe withdrawal symptoms petitioner described in his testimony. None of the eyewitnesses at the BCADC who observed petitioner on April 7, 2001 offered any indication they witnessed petitioner exhibiting any of the withdrawal symptoms Dr. Stowe or Dr. Lundberg–Love identified as typical of Klonopin withdrawal. Dr. Stowe, who treated petitioner from August, 2000 through petitioner's arrest in April, 2001 could not corroborate petitioner's self-serving testimony suggesting petitioner had been over-medicating himself with Klonopin for many months with pills petitioner obtained from a third-party. In fact, petitioner's testimony during the state habeas hearing regarding how much Klonopin he was taking during the time period Dr. Stowe was trying to wean petitioner off Klonopin was a veritable fount of internal inconsistency, ambiguity, and self-contradiction.[121]

Furthermore, as was explained above, it was undisputed during petitioner's state habeas corpus hearing that petitioner never communicated to his trial counsel any information suggesting petitioner was experiencing drug withdrawal symptoms or otherwise in need of medical attention during petitioner's interviews on April 6–7, 2001.[122] Petitioner's trial counsel testified without contradiction during the state habeas hearing that they stood ready, willing, and able to challenge as involuntary petitioner's written statement and would have welcomed any information suggesting petitioner was experiencing drug withdrawal during his police interrogations but petitioner simply failed to communicate any such information to them.[123] Under such circumstances, the state habeas court's factual determination that petitioner did not suffer withdrawal symptoms on April 6–7, 2001 was an eminently reasonable determination based upon the evidence before that court. Petitioner's trial counsel cannot reasonably be faulted for professionally deficient performance when the petitioner admitted he failed to communicate to his trial counsel the very information petitioner now contends his trial counsel should have presented to the state trial court at the pretrial hearing on petitioner's motion to suppress. Petitioner admitted during his testimony at the state habeas hearing that he concealed from his trial counsel any and all information suggesting petitioner was suffering drug withdrawal symptoms on April 6–7, 2001.

**121.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 38–41, 46–50, 52–54, 56–57, 61–62, 64–66, 76, 252–56, 259–60.

**122.** S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 28, 32–37, 270–72, 275, 278, 292–94, 296; Volume 4 of 10, testimony of Michael Ugarte, at pp. 54–56, 61–71, 73–77, 79–80, 82, 86, 103– 04, 116–17, 119–21, 137–38; testimony of Patrick Hancock, at pp. 143–45, 157–65, 168, 175, 177–78.

**123.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Michael Ugarte, at pp. 54–56, 61–71, 73–77, 79–80, 82, 86, 103–04, 116–17, 119–21, 137–38; testimony of Patrick Hancock, at pp. 143–45, 157–65, 168, 175, 177–78.

Insofar as petitioner argues his trial counsel should have somehow discerned from petitioner's medical records that petitioner was experiencing Klonopin withdrawal on April 6–7, 2001, that argument fails for two, equally compelling, reasons. First, the state habeas court reasonably found from the evidence before it that petitioner did not, in fact, experience withdrawal symptoms on April 6–7, 2001. Petitioner's trial counsel cannot reasonably be faulted for failing to discover a "fact" which did not exist at the time of the pretrial hearing on petitioner's motion to suppress. Second, according to the uncontradicted testimony of petitioner's own medical expert, Dr. Stowe, petitioner's medical records showed that petitioner had been successfully weaned off of Klonopin in February, 2001.[124] Insofar as petitioner points to the fact he began receiving Klonopin shortly after he was arrested, petitioner himself admitted during his testimony that he specifically requested Klonopin from the BCADC psychiatric staff and believed he could obtain any medication he wanted if he convinced the BCADC staff it would keep him calm.[125] Thus, there was nothing objectively unreasonable with the failure of petitioner's trial counsel to discover evidence showing petitioner experienced drug withdrawal symptoms on April 6–7, 2001. The state habeas court reasonably determined that no credible evidence of same has ever existed.

Furthermore, this Court independently concludes there was nothing objectively unreasonable with the failure of petitioner's trial counsel to discover prior to trial petitioner's wholly incredible assertion that he was suffering from severe Klonopin withdrawal symptoms on April 6–7, 2001.

In light of the foregoing, this Court concludes the state habeas court's conclusion that this assertion of ineffective assistance failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

b. *No Prejudice*

 Petitioner was afforded a rare opportunity to completely re-litigate his originally unsuccessful motion to suppress in the context of his state habeas corpus proceeding. The same state district trial judge who presided over petitioner's pretrial hearing on his motion to suppress and petitioner's capital murder trial also presided over petitioner's state habeas corpus proceeding. As was explained in detail in Section I.L. above, during petitioner's state habeas corpus proceeding, state district judge Mary Roman heard petitioner's testimony, reviewed petitioner's voluminous medical records, heard testimony from petitioner's medical and mental health experts, and heard testimony from the State's witnesses, including detectives Carian and Kellogg and several BCADC personnel who encountered petitioner on April 7, 2001. Judge Roman was uniquely qualified to make credibility determinations regarding the diametrically opposing descriptions of petitioner's demeanor on April 6–7, 2001 offered by the petitioner, on the one hand, and all of the State's witnesses, on the other.

Judge Roman reviewed all of the new evidence petitioner argued his trial counsel

---

124. S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at pp. 16–17.

125. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 259–60.

should have presented during the original hearing on petitioner's motion to suppress and concluded, despite petitioner's testimony alleging he was suffering from severe Klonopin withdrawal symptoms on April 6–7, 2001, petitioner's written confession and petitioner's waiver of his Fifth and Sixth Amendment rights were voluntary. For the reasons set forth at length above in Section III.D. above, Judge Roman reasonably determined petitioner's account of the circumstances surrounding the creation, editing, and execution of petitioner's written statement on April 7, 2001 were wholly incredible.[126] Likewise, Judge Roman's conclusions that petitioner's written statement was voluntary, as was petitioner's waiver of his Fifth and Sixth Amendment rights, are not subject to debate among reasonable jurists.

This Court independently concludes there is not even a remote possibility, much less a reasonable probability, that, but for the failure of petitioner's trial counsel to present the state trial court with any or all of the evidence petitioner presented during his state habeas corpus proceeding, the outcome of petitioner's trial (or the hearing on petitioner's pretrial motion to suppress) would have been different. There is no rational basis for concluding Judge Roman's objectively reasonable factual findings and legal conclusions issued in the course of the petitioner's state habeas corpus proceeding (the relevant portion of which the Texas Court of Criminal Appeals expressly adopted) would have been any different had petitioner's trial counsel presented that very same evidence during the pretrial hearing on petitioner's motion to suppress his written statement. In fact, had petitioner's trial counsel offered all of the evidence petitioner presented during his state habeas corpus proceeding at the pretrial motion to suppress hearing, it is highly likely Judge Ramon would have issued the same or similar, objectively reasonable, factual findings and legal conclusions rejecting as incredible petitioner's assertion that he suffered severe Klonopin withdrawal symptoms on April 6–7, 2001. Judge Roman heard all of petitioner's new evidence and reasonably rejected petitioner's factual assertions as incredible. There was substantial, if not overwhelming, evidence presented during petitioner's pretrial hearing on his motion to suppress, as well as petitioner's state habeas corpus proceeding, establishing petitioner's written statement executed April 7, 2001 was voluntarily given and that petitioner's waiver of his Fifth and Sixth Amendment rights on April 7, 2001 was voluntary, intelligent, and knowing.

The state habeas court's conclusion that petitioner's complaints about his trial counsel's failure to present all of the new evidence (which petitioner presented during his state habeas corpus proceeding) during the pretrial hearing on petitioner's motion

---

**126.** As was explained above, petitioner testified during his state habeas corpus hearing that he endured months of severe withdrawal symptoms associated with Dr. Stowe's reduction in petitioner's Klonopin dosage immediately prior to his arrest on April 6, 2001. However, petitioner's own medical records reveal that petitioner was a "no show" or cancelled appointments with Dr. Stowe several times in the months immediately prior to petitioner's arrest, specifically on January 16, January 30, February 13, and April 4, 2001. See, e.g., Defense Exhibit 3–A, S.F. State Habeas Hearing, Volume 8 of 10, at pp. 121–55; Defense Exhibit 3, S.F. State Habeas Hearing, Volume 7 of 10, at pp. 31, 33, 38, 40; State's Exhibit 1, S.F. State Habeas Hearing, Volume 6 of 10, at pp. 39, 41, 65, 121. For a person who described himself as desperate during the Winter of 2000–01 to convince Dr. Stowe to re-institute his Klonopin prescription and increase the dosage, petitioner's rather casual conduct toward his medical appointments with Dr. Stowe belies that of a person who was suffering from severe Klonopin withdrawal during that same time frame.

to suppress failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. On the contrary, the state habeas court's conclusion in that regard was an eminently reasonable application of the well-settled *Strickland* standard.

### 4. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's state habeas corpus proceeding, of petitioner's ineffective assistance complaint about the performance of petitioner's trial counsel in connection with the pretrial hearing on petitioner's motion to suppress his written statement was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's third claim herein does not warrant federal habeas corpus relief.

### D. Failure to Exclude Evidence of Sarah Gonzales' and Priscilla Almares' Murders

### 1. The Claim

In his fourth claim herein, petitioner argues his trial counsel should have argued

the fourth paragraph of petitioner's indictment was unconstitutionally vague as applied to petitioner because *under Texas law* the murder of Priscilla Almares in December, 1994 was simply too attenuated, both temporally and in terms of its modus operandi, to have been committed as part of "the same scheme or course of conduct" as the murder of Rosado.[127] Put more simply, petitioner argues his trial counsel, who did move to quash the fourth paragraph of the petitioner's indictment, should have presented different factual and legal arguments to support their motion to quash the indictment, to wit, that the fourth paragraph of the indictment should have been quashed because the murders of Rosado and Almares were too far apart in time and too dissimilar in their manner of commission to have been committed "pursuant to the same scheme and course of conduct." Petitioner argues further that, had his trial counsel properly raised such an "as-applied void-for-vagueness" challenge to the fourth paragraph of petitioner's indictment, the state trial court would have been compelled to quash that paragraph and the prosecution would thereafter have been unable to introduce any evidence at petitioner's trial relating to Sarah Gonzales or Priscilla Almares' murders because those murders would have been extraneous bad acts, inadmissible under applicable Texas law.[128]

### 2. State Court Disposition

In his application for state habeas corpus relief, petitioner included a similar ineffective assistance claim as his second ground for state habeas corpus relief.[129]

---

**127.** Brief in Support of Petition, at pp. 21–31.

**128.** *Id.*

**129.** State Habeas Transcript, Volume I, at pp. 13–38.

Because petitioner's fourth claim herein is so factually convoluted and, in this Court's judgment, based upon a rather myopic view of the many obvious similarities between the murders of Gonzales and Almares and the murder of Rosado, it is necessary to examine what petitioner actually argued before the

The state habeas trial court rejected this claim on the merits and, in so doing, made the following findings and conclusions:

* * * Also, contrary to applicant's claim, the evidence was sufficient to establish, as alleged in the indictment, that all three murders occurred pursuant to the same scheme or course of conduct.

Dr. DiMaio testified to a number of similarities found in all three of these cases. According to Dr. DiMaio, in all three of these cases, there were relatively young females who were abducted, sexually assaulted, and killed by asphyxiation. He testified that all three victims had hemorrhages to the eyes. He observed that, with Rosado, bleach was used to clean the body, and the other two bodies were also clean for this type of crime. He testified that there were also bruises about the head to all three victims, as if they had been struck about the head. He explained that all three victims had been beaten enough to cause unconsciousness. And he explained that, in all three cases, there was no evidence of resistance to asphyxia, suggesting that they were all helpless at the time of strangulation.

Additionally, the evidence in this case also demonstrates that all three victims were abducted or last seen alive within the same area of San Antonio, and the photographs of the victims admitted into evidence in this case demonstrate that all three victims shared certain similarities in appearance: they were all Hispanic appearing females, they were all between 5′ 2 1/2″ and 5′ 5″ tall, they all had dark brown to black hair color, and their hair appears to have been about

state habeas court in support of petitioner's second claim for state habeas relief:

The only evidence even connecting Applicant to the murders of Almares and Gonzales was the DNA from the semen sample taken from Almares' rectal swab. Otherwise the evidence does not show to what extent, if any, Applicant actually participated in the murders themselves, either as a party or as a principal actor. The killings were separated in time by more than six years. It is true they show certain generic similarities, common to most abduction/robbery/rape/murder cases. But these similarities are hardly sufficient to establish a "regular mode or pattern of behavior." For example, all the victims died of asphyxiation. But while Almares and Gonzales were strangled in some undetermined manner, the medical examiner could not say whether Rosado's asphyxiation was the result of strangulation. The medical examiner also testified that all the victims had been bound, beaten, and forcibly raped. While the medical examiner could detect that something like bleach had apparently been used to try to clean Rosado's body, all he could say about the bodies of Almares and Gonzales was that they were "unusually clean" when found, not that any concerted effort had been made to destroy evidence. Moreover, the beating inflicted on Rosado was much more severe than those that Almares and Gonzales endured. The medical examiner could not say how any of the rapes were perpetrated, or how many rapists were involved. And while Almares and Gonzales were unceremoniously "dumped" by the side of the road after they were killed, Rosado was meticulously buried. Rosado, at thirty-seven years old, was much older than Almares and Gonzales, who were only 12 and 13 years old, respectively.

None of this evidence suffices to establish a "regular mode or pattern of behavior." There is nothing distinctive that the separate occurrences have in common to suggest a "mode" or "pattern" of any sort, much less a "regular" mode or pattern. Unlike in *Corwin*, there were only two occurrences involved in this case, rather than multiple and periodic rape/murders spread over the course of a number of years. Thus, the generic similarities shown by the State in this case do not establish a *regular* mode or pattern of behavior, even if it can be said that some rough "mode" or "pattern" is shown.

State Habeas Transcript, Volume I, at pp. 17–18 (*record citations omitted*).

the same length at the time of their deaths.[130]

\* \* \*

Applicant alleges that trial counsel should have moved to quash paragraph D of his indictment. To support his argument, however, he points to evidence adduced at trial as well as to arguments that the prosecutor made to the jury. The Court of criminal Appeals has held that the sufficiency of an indictment may not be supported or defeated by evidence. *See State v. Rosenbaum,* 910 S.W.2d 934, 948 (Tex.Crim.App. 1994) (dissenting op. Adopted on reh'g) (sufficiency of indictment at pretrial motion to quash indictment cannot be supported or defeated by evidence). The purpose of a motion to quash is to address the sufficiency of the pleading itself, not to force the State to try its case in front of the court before it actually tries its case in front of the jury. *Woods v. State,* 153 S.W.3d 413, 415 (Tex.Crim.App.2005) (explaining that the purpose of a pretrial motion or a motion to quash "is to address preliminary matters, not the merits of the case itself. Preliminary matters are those issues that can be determined before there is a trial on the general issue of the case."). A challenge to the sufficiency of an indictment is limited to the face of the indictment itself, and may not be supported by evidence, even if there is any, that would prove the State cannot sustain its burden. *See Carpenter v. State,* 477 S.W.2d 22, 23 (Tex.Crim.App.1972) (explaining that a court may not look beyond the face of the murder indictment to see if there is sufficient evidence to support it.).

The record of this case indicates that trial counsel for Applicant actually did pursue the quashal [sic] of the indictment pending against him on the grounds that, "the indictment … doesn't state any type of … act or omission committed by Mr. Hernandez that constitutes a similar scheme and or course of conduct as alleged in the indictment," and that, "the indictment does not set out sufficient facts to give defendant notice of what they are claiming to be a common scheme and course of conduct." Counsel is not required, however, to pursue futile motions. *Mooney v. State,* 817 S.W.2d 693, 698 (Tex. Crim.App.1991). In this case the motion to quash that applicant alleges his counsel should have pursued would have been futile. It would not have entitled him to relief, so his counsel could not be ineffective for failing to pursue it.[131]

The Texas Court of Criminal Appeals adopted this portion of the state habeas trial court's findings and conclusions when it denied petitioner's state habeas corpus application on the merits. *Ex parte Hernandez,* WR–69,724–01, 2008 WL 4151799 (Tex.Crim.App. September 10, 2008).

### 3. *Synthesis*

#### a. *No Deficient Performance*

█ The fundamental problem with this ineffective assistance claim is that petitioner's pretrial "as applied void-for-vagueness" challenge to the fourth paragraph of his indictment, which forms the lynch pin for petitioner's fourth claim herein, is precluded by applicable state law. More specifically, the state habeas court concluded *as a matter of state law*

---

**130.** State Habeas Transcript, Volume II, at pp. 390–92 *(record citations omitted)*; State Habeas Transcript, Volume III, at pp. 55–57 *(record citations omitted)*.

**131.** State Habeas Transcript, Volume II, at pp. 394–96; State Habeas Transcript, Volume III, at pp. 59–61.

that the types of legal and factual arguments petitioner urged in his first and second claims for state habeas relief were are not cognizable *under Texas law* in a pretrial motion to quash an indictment.[132] Thus, the Texas Court of Criminal Appeals implicitly rejected the construction of Texas law urged by petitioner in his first and second claims for state habeas relief and re-urged by petitioner in his fourth claim for federal habeas relief herein.

The state habeas court's conclusions regarding the scope and application of state law (including its determination that the types of arguments urged by petitioner were not cognizable under applicable state law in a pretrial motion to quash a Texas indictment) are binding on this federal habeas court. Insofar as petitioner suggests in his pleadings in this Court that the Texas Court of Criminal Appeals erroneously construed applicable *Texas law* in rejecting on the merits petitioner's argument that the murders of Rosado, on the one hand, and those of Gonzales and Almares, on the other, were too attenuated in time and dissimilar in modus operandi to have been committed "pursuant to the same scheme and course of conduct" as alleged in the fourth paragraph of petitioner's indictment, that argument fails for two, equally compelling, reasons. First, the Texas Court of Criminal Appeals' construction of applicable state law during petitioner's state habeas corpus proceeding binds this Court's federal habeas review of same. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Pa-*

*redes v. Quarterman*, 574 F.3d 281, 291 (5th Cir.2009) (a state court's interpretation of state law binds a federal court sitting in habeas corpus), *cert. denied,* ── U.S. ──, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2011); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir.2006) (holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir.2004) ("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson v. Cain*, 215 F.3d 489, 494 (5th cir.2000) (holding a federal habeas court may not review a state court's interpretation of its own law); *Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir.1998) (holding the same), *cert. denied,* 526 U.S. 1089, 119 S.Ct. 1501, 143 L.Ed.2d 654 (1999). Second, errors in the construction or application of state law do not furnish an independent ground for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

Thus, petitioner's fourth claim herein boils down to an argument that petitioner's trial counsel should have done what was

---

**132.** State Habeas Transcript, Volume II, at pp. 394–96; State Habeas Transcript, Volume III, at pp. 59–61.

legally impossible under Texas law, i.e., present a set of legal and factual arguments in the context of petitioner's pretrial motion to quash his indictment that were not cognizable under Texas law in such a pretrial motion. Whatever else it might command, the first prong of *Strickland* analysis does not compel trial counsel to perform that which is legally impossible.[133] The state habeas court's conclusion (which this Court is not free to second-guess) that the type of pretrial motion to quash urged by petitioner in his fourth claim for relief herein would have been futile as a matter of state law fully supports the state habeas court's conclusion that petitioner's trial counsel did not fail to furnish objectively reasonable legal assistance to petitioner. Petitioner's trial counsel did attempt to challenge the fourth paragraph of petitioner's indictment. That they failed to raise a host of factual and legal arguments that were not cognizable in such a motion did not cause their performance to fall below an objective level of reasonableness.

Moreover, petitioner's trial counsel did challenge the fourth paragraph of petitioner's indictment in a pretrial motion to quash in which said counsel argued as follows:

> The indictment does not "charge the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant and with what degree of certainty that will give the Defendant notice of the particular offense with which he is charged ..." in violation of TEX. CODE CRIM. ANN. Art. 21.11 and the Fifth, Sixth and Fourteenth Amendments to the united States Constitution and article I, §§ 10 and 19 of the Texas Constitution.[134]

Petitioner raised the state trial court's failure to grant this same motion to quash as his second point of error on direct appeal. On direct appeal, the Texas Court of Criminal Appeals rejected same on the mer-

---

**133.** Petitioner does not identify any legal authority establishing that it was impossible as a matter of state law for him to *ever* present a Texas appellate court with his contention that the murders of Rosado and Gonzales and Almares were not committed "pursuant to the same scheme and course of conduct." Nor could such an argument seriously have been urged. The principal state appellate opinion urged by petitioner in support of his fourth claim herein is *Corwin v. State,* 870 S.W.2d 23 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 826, 115 S.Ct. 95, 130 L.Ed.2d 44 (1994). In *Corwin,* the Texas Court of Criminal Appeals reviewed on direct appeal following a capital murder conviction the same type of legal and factual arguments petitioner urges his trial counsel should have raised in petitioner's pretrial motion to quash petitioner's indictment, i.e., complaints about the vagueness of the serial killer provision of the Texas capital murder statute "as applied" to a series of murders and attempted murders that took place over a number of years, i.e., from 1975 through 1988. The Texas Court of Criminal

Appeals held the Texas serial killer statute and Corwin's indictment furnished sufficient notice to avoid an "as applied unconstitutional vagueness" challenge. *See Corwin v. State,* 870 S.W.2d at 27–29 & n. 6 (examining the evidence presented during the punishment phase of Corwin's capital murder trial relevant to the pattern of his behavior over the years). Subsequently, the Fifth Circuit held the serial killer provision of the Texas capital statute (currently found in Texas Penal Code Annotated § 19.03(a)(7)(B) (Vernon Supp. 2010)), was not unconstitutionally vague on its face. *Corwin v. Johnson,* 150 F.3d 467, 475–76 (5th Cir.), *cert. denied,* 525 U.S. 1049, 119 S.Ct. 613, 142 L.Ed.2d 548 (1998). Thus, petitioner was not completely deprived of an opportunity to present his "applied unconstitutional vagueness" challenge to the Texas appellate courts. He was only precluded by state law from obtaining a *pretrial* ruling on those arguments in the context of his motion to quash his indictment.

**134.** Trial Transcript, at p. 54.

its.[135] Thus, petitioner's trial counsel did everything necessary to preserve for state appellate review a challenge to the validity of petitioner's indictment. Said counsel cannot be faulted for their failure to raise an "as applied vagueness" *evidentiary* challenge to petitioner's indictment in a pretrial context when Texas law did not permit them to raise such an evidence-based challenge in that manner. *See Paredes v. Quarterman*, 574 F.3d at 291 n. 13 (failure to raise a meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir.2007) (failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314, 128 S.Ct. 1874, 170 L.Ed.2d 752 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003).

Thus, insofar as petitioner complains that his trial counsel failed to exclude the evidence of his "extraneous" bad acts, specifically petitioner's involvement in the murders of Almares and Gonzales, after first quashing the fourth paragraph of the indictment, that complaint is premised on the erroneous presumption that it was possible for petitioner's trial counsel to have obtained a pretrial ruling on what was essentially an evidence-based challenge to the validity of paragraph four of petitioner's indictment. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U.S. 648, 656 n. 19, 104 S.Ct. 2039, 2045 n. 19, 80 L.Ed.2d 657 (1984).

Nor is counsel required to assert every potential argument or claim available. *See Knowles v. Mirzayance*, 556 U.S. 111, ——, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) ("this Court has never required defense counsel to pursue every claim or defense regardless of its merit, viability, or realistic chance for success.").

### b. *No Prejudice*

#### (1) *Impossible to Get a Pretrial Ruling*

The state habeas court construed Texas law as not permitting precisely the type of evidence-based challenge to the sufficiency of petitioner's indictment that petitioner argues his trial counsel should have presented in a pretrial context. Without a ruling declaring Gonzales and Almares' murders to be "extraneous bad acts," there was no legal basis for petitioner's complaint that his trial counsel failed to "exclude" evidence of same at trial. This precludes a finding of "prejudice" under the *Strickland* standard. *Paredes v. Quarterman*, 574 F.3d at 291; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir.1999).

Moreover, in light of the state habeas court's eminently reasonable factual findings about the many similarities between the murders of Rosado, on the one hand, and Gonzales and Almares, on the other, there is no reasonable probability that, but for the failure of petitioner's trial counsel to urge an invalid-under-state-law, evidence-based, challenge to the sufficiency of paragraph four of petitioner's indictment, the outcome of either phase of petitioner's capital murder trial would have been any different. Even if petitioner's trial counsel had presented the state trial court with the exact same evidence and arguments petitioner presented to the state habeas court in support of his first ground for state

---

**135.** *Hernandez v. State*, AP–74,451 (Tex.Crim. App. March 23, 2005), at pp. 7–8.

habeas relief, there is no reasonable probability the outcome of petitioner's trial would have been any different. *See Knowles v. Mirzayance,* 556 U.S. at —, 129 S.Ct. at 1422 (holding no prejudice could be shown by defendant complaining about his counsel's failure to urge an insanity defense after the same jury had ruled in favor of the prosecution after hearing the same evidence petitioner claimed should have been re-urged in support of his insanity defense).

### (2) *No Underlying Due Process Violation*

Furthermore, even if this Court were to delve into the underlying merits of petitioner's evidence-based constitutional challenge to his indictment, petitioner cannot satisfy the prejudice prong of *Strickland.* Petitioner argued that, under the Texas Court of Criminal Appeals' holding in *Corwin,* the evidence introduced at trial showing petitioner's involvement in both Almares' and Rosado's murders was inadequate to show both murders were committed "pursuant to the same scheme or course of conduct" because those murders were too distant in time and involved too many dissimilarities.

However, the temporal separation between petitioner's participation in the murders of Hispanic women was hardly conclusive of anything. The evidence considered by the Texas Court of Criminal Appeals in *Corwin* in rejecting a similar, evidence-based, challenge to an indictment included a showing that Corwin had abducted, raped, strangled, and stabbed (some fatally and some non-fatally) several victims with the first such crime occurring in 1975 and more such crimes occurring in 1987 and 1988. The long separation (twelve years) between Corwin's first two crimes was explained by Corwin's lengthy prison stay following his conviction for that offense. In petitioner's case, the period of apparent criminal inactivity between petitioner's participation in the murders of Almares and Rosado (between December, 1994 and March, 2001) can be explained by two factors made very clear from this Court's independent review of the record in this case. First, petitioner was incarcerated for a portion of the time frame between the murders, obtaining release in August, 1995. Second, not long after his release on parole, petitioner began taking a prescription medication which he reported had a negative impact on his sex drive.[136] The evidence introduced during the petitioner's capital murder trial portrayed petitioner as not merely a serial killer but also a serial rapist.[137] Petition-

---

**136.** More specifically, petitioner began taking Paxil in June, 1996 and continued taking that medication for many months thereafter but soon began reporting the drug had a negative impact on his sex drive. S.F. State Habeas Hearing, Volume 7 of 10, at p. 68; Volume 8 of 10, at pp. 277, 288, 338, 345, 349, 351–55, 364; Volume 9 of 10, at pp. 667, 669, 671, 678, 681, 686, 743–44, 762. Petitioner's physicians switched petitioner back and forth between Paxil and Prozac several times in the following years. *Id.* More specifically, in December, 1997, petitioner was switched from Paxil to Prozac. S.F. State Habeas Hearing, Volume 8 of 10, at p. 338. In July, 1999, petitioner requested and obtained a change from Prozac back to Paxil. *Id.,* at pp. 345, 364. In June, 2000, however, petitioner

asked to return to Prozac, citing his diminished sex drive. *Id.,* at pp. 206, 351. Petitioner reported shortly thereafter that his sex drive had returned. *Id.,* at p. 204.

**137.** In addition to the uncontradicted DNA evidence linking petitioner's to Almares' sexual assault and murder, two witnesses testified that, with the assistance of Minjarez, in January, 1991, petitioner lured a neighbor to petitioner's apartment, locked the neighbor inside, and then returned to the neighbor's apartment and raped the neighbor's wife. S.F. Trial, Volume 27, testimony of Danny G. Zapata, at pp. 22–27; testimony of Anna Diaz, at pp. 105–07. Petitioner later pleaded guilty to a charge of burglary with intent to commit

er's chemically-reduced sex drive may well account for his lack of fatal sexual assaults upon women for a substantial portion of the time between the murders of Almares and Rosado.

Petitioner's efforts to distinguish the circumstances of Rosado's murder from those of Gonzales and Almares are likewise unconvincing. Petitioner points to the difference in the ages between Rosado (37) and his two prior victims (ages 12 and 13). Yet Abdygapparova stated to police that Rosado appeared to her to be "young."[138] As noted by the medical examiner and the state habeas trial court, all three victims shared a myriad of physical characteristics, including their ethnic heritage, hair color, hair length, and height. The autopsy results in all three cases were eerily similar.

All three victims had been bound, beaten about the head and face, sexually assaulted in a violent manner, and asphyxiated in a peculiar way that left bruises on the back of the neck, indications all three victims had offered little or no resistance when they were being asphyxiated, and made it impossible to determine the precise method of strangulation.[139] All three bodies showed extensive bruising but Rosado, whom both Abdygapparova and petitioner indicated in their statements had fought violently with Minjarez, showed more extensive bruising.[140] Given the immaturity

of Gonzales and Almares at the time of their rapes and murders, it is hardly surprising they offered less resistance than an adult woman like Rosado. Besides the precise manner of their deaths, the circumstances of the crimes in general showed more than coincidental similarities. All three victims had been abducted or last seen in public in the same part of San Antonio. All three victims were bound, beaten about the head and face, and violently sexually assaulted. All were asphyxiated in a manner that made it impossible to ascertain the precise method of strangulation, none appeared to have offered much resistance while they were being asphyxiated, and then their bodies were disposed of in fairly isolated locations.[141] Rosado's body had been cleaned with an alkaline-based bleach and the two girls' bodies appeared "unusually clean" in the medical examiner's words. While there were admittedly differences in some of the details of the two crimes, nothing in the serial killer provision of the Texas capital murder statute appears to require that multiple murders be identical in every respect for them to qualify as having been committed "pursuant to the same scheme or course of conduct."

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what

sexual assault arising out of that incident. State's Exhibit 267, S.F. Trial, Volume 30.

138. Statement of Asel Abdygapparova, Defendant's Exhibit 1, S.F. State Habeas Hearing, Volume 7 of 10, at p. 2 ("She looked young. I didn't see her face, but just the way she looked made me feel she was young.").

139. S.F. Trial, Volume 21, testimony of Steven A. Erickson, at pp. 131, 137–38, 144, 149–51, 153–54, 156–58, 160; Volume 24, testimony of Vincent DiMaio, at pp. 136, 151–77.

140. S.F. Trial, Volume 24, testimony of Vincent DiMaio, at pp. 157–59, 160–63, 165–66.

141. Insofar as petitioner argued before the state court that the girls' bodies had been "dumped" off the side of a road while Rosado had been "meticulously" buried, that argument is specious. Rosado was unceremoniously buried in a shallow grave and was uncovered by a police officer who moved a few inches of top soil with his hands. S.F. Trial, Volume 22, testimony of Doug Ryan, at pp. 79–82.

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Gonzales v. Carhart,* 550 U.S. 124, 148–49, 127 S.Ct. 1610, 1628, 167 L.Ed.2d 480 (2007). The serial killer provision of the Texas capital murder statute (currently-found in Texas Penal Code Annotated § 19.03(a)(7)(B) (Vernon Supp. 2010)), is not unconstitutionally vague on its face. *Corwin v. Johnson,* 150 F.3d 467, 475–76 (5th Cir.), *cert. denied,* 525 U.S. 1049, 119 S.Ct. 613, 142 L.Ed.2d 548 (1998). It provides persons of ordinary intelligence a reasonable opportunity to know what is prohibited. *Id.*

To succeed in his as-applied void-for-vagueness challenge, petitioner must show the Texas serial killer statute is vague *in his case* and that he could not have known that participating in the murders of both Almares and Rosado would subject him to prosecution under the Texas capital murder statute. *United States v. Clark,* 582 F.3d 607, 614 (5th Cir.2009), *cert. denied,* — U.S. ——, 130 S.Ct. 1306, 175 L.Ed.2d 1091 (2010). As the state habeas trial court explained, the medical examiners who performed their autopsies testified (and the other evidence at trial established) Rosado, Gonzales, and Almares were all (1) abducted from (or at least last seen in) public locations in the same part of San Antonio, (2) bound, (3) beaten about the head and face, (4) violently sexually assaulted, and (5) asphyxiated in a manner that (a) left bruising on their necks and indications they offered little or no resistance while they were asphyxiated and (b) made it impossible to ascertain whether they had been strangled manually or with an irregular ligature like a twisted piece of cloth. Under such circumstances, this Court independently concludes that petitioner's constitutional due process rights were not violated by virtue of his indictment and prosecution under the Texas serial killer provision of the Texas capital murder statute. Petitioner had reasonable notice that his conduct could subject him to prosecution as a serial killer. *See United States v. Clark,* 582 F.3d at 614 (rejecting "as applied" void-for-vagueness challenge to a criminal charge of illegally importing an alien for "immoral purposes" where evidence showed the defendant had transported a woman from Africa into virtual sex slavery in the United States).

### 4. *Conclusions*

Petitioner's complaints about the performance of his trial counsel in connection with petitioner's pretrial motion to quash paragraph four of the indictment and said counsels' alleged failure to "exclude" evidence of Gonzales' and Almares' murders from the guilt-innocence phase of trial fail to satisfy either prong of *Strickland* analysis. It was impossible under applicable Texas law for petitioner's trial counsel to have raised the evidentiary arguments in the context of a pretrial motion to quash petitioner's indictment that petitioner now argues his trial counsel should have raised in that context.

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's state habeas corpus proceeding, of petitioner's ineffective assistance complaints about the performance of petitioner's trial counsel in connection with petitioner's pretrial motion to quash petitioner's indictment and the exclusion of evidence of Gonzales' and Almares' murder during the guilt-innocence phase of petitioner's capital murder trial was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Petitioner's fourth claim herein does not warrant federal habeas corpus relief.

### E. *Failure to Object to Improper Prosecutorial Argument*

#### 1. *The Claim*

In his fifth claim herein, petitioner argues his trial counsel should have objected to that portion of the prosecution's closing argument at the punishment phase of petitioner's capital murder trial in which the prosecutor suggested the jury should consider how the victims' families wished the jury to answer the capital sentencing special issues.[142]

#### 2. *State Court Disposition*

During the punishment phase of petitioner's trial, petitioner's trial counsel presented numerous members of petitioner's family and a friend of petitioner, all of whom made emotional appeals to the jury to spare petitioner's life.[143] The prosecution made no objection to these emotional appeals for mercy and engaged in only limited cross-examination of most of these witnesses. During closing argument at the punishment phase of petitioner's trial, petitioner's trial counsel repeatedly-emphasized the testimony of petitioner's family members and the fact they had all asked the jury to spare petitioner's life.[144] In

---

**142.** Brief in Support of Petition, at pp. 31–36.

**143.** Petitioner's aunt expressly asked the jury to spare petitioner's life and blamed petitioner's problems on the violent death of petitioner's father. S.F. Trial, Volume 28, testimony of Andrea Torres, at p. 116.

Petitioner's self-described "good friend" pleaded with the jury to spare petitioner's life, arguing petitioner was not a threat to society. S.F. Trial, Volume 28, testimony of Joe Vargas, at pp. 123–24.

Petitioner's sister-in-law pleaded with the jury, concluding "He's a good person" and "He's not the monster that he is set out to be." S.F. Trial, Volume 28, testimony of Elizabeth Hernandez, at p. 129.

One of petitioner's younger brothers directly asked the jury to spare petitioner's life, testifying petitioner was a "real caring, real loving" person who had cried when re-living their father's death. S.F. Trial, Volume 28, testimony of Mario Hernandez, at p. 137.

Petitioner's younger sister also asked the jury to spare petitioner's life and testified petitioner had been depressed ever since their father died in the petitioner's arms but petitioner had gone back to school and was attending college. S.F. Trial, Volume 28, testimony of Melissa Arnold, at pp. 144–45.

Petitioner's mother made an even more emotional plea for petitioner's life, telling his capital sentencing jury that Petitioner was a "very loving, caring," person, "I know in my heart he did not kill anyone," and "He's not

that type of person." S.F. Trial, Volume 28, testimony of Gloria Hernandez, at p. 157.

Petitioner's cousin also asked petitioner's jury to spare petitioner's life, pointing out petitioner had earned a GED, enrolled in college, and shown affection toward petitioner's children, even after petitioner divorced his children's mother. S.F. Trial, Volume 28, testimony of Richard Torres Jimenez, Jr., at pp. 167–68.

Petitioner's other brother testified in his Marine Corps uniform about the tragic impact their father's murder had on their family, and petitioner in particular, and asked the jury to spare petitioner's life. S.F. Trial, Volume 28, testimony of Danny Hernandez, at pp. 176–78.

**144.** "I don't think there is any doubt among anybody the feelings that his family is conveying, that he's important to them. They have asked, each and every one of them, of you to spare his life." S.F. Trial, Volume 28, at p. 205.

"So, to summarize on that bit, ladies and gentlemen, please if you get to issue number three, please consider as mitigation the situation, very tragic situation that happened in 1986 and the guilt that I think has been expressed by his family as to what this young man carried on his shoulders and still carries on his shoulders today." *Id.,* at p. 206.

"Ramon Hernandez is what you found him guilty of. We do not take exception to that. I think his family knows that. I think it's diffi-

response, the prosecution made the following remark which petitioner argues was an inappropriate and objectionable "appeal to sympathy or prejudice":

> * * * And I respectfully suggest to you, and I want to commend all these folks for how well they behaved throughout this trial. And don't you know that if they could, they would stand up here and cry and tell you what they believe the proper answer to those questions is, are? [145]

Petitioner raised an abridged version of this same ineffective assistance claim as his tenth claim for state habeas corpus relief, arguing (1) the prosecutor had gestured toward the victims' families while making these statements, (2) because there had been no "victim impact" testimony from the victims' family members, such prosecutorial statements were improper comments on matters outside the record, and (3) even if the victims' family members had testified, and offered victim impact evidence, it would have been improper under Texas law for them to have opined as to the appropriate sentence for petitioner.[146] The state habeas trial court (1) found there was no credible evidence establishing the prosecutor had gestured toward the victims' families when making these statements,[147] (2) concluded this complaint did not satisfy the deficient perform-

ance prong of *Strickland,*[148] and (3) concluded this complaint did not satisfy the prejudice prong of *Strickland* because it was only a passing remark, not a major part of the prosecutor's argument, and unlikely to have actually harmed petitioner.[149]

### 3. *Synthesis*

#### a. *No Deficient Performance*

■ In his pleadings herein, petitioner aggressively challenges the state habeas trial court's *reasoning* supporting that court's conclusion that petitioner's complaint about his trial counsels' failure to object to the prosecutor's comment in question failed to satisfy the deficient performance prong of *Strickland.* Petitioner misunderstands the proper role of this Court sitting in federal habeas review of a state court's conclusions regarding either prong of the *Strickland* test.

Under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court, the petitioner must do more than convince the federal court the state court applied *Strickland* incorrectly—the petitioner must show the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone,* 535 U.S. at 699, 122 S.Ct. at 1852.

---

cult for them to say. I think Melissa said there is a dark side of him that we didn't know about. But like I said, they found some redeeming qualities in him. But they all asked you to spare his life, ladies and gentlemen." *Id.,* at p. 217.

**145.** S.F. Trial, Volume 28, at pp. 226–27.

**146.** State Habeas Transcript, Volume I, at pp. 76–78.

**147.** "No credible witnesses at applicant's habeas hearing remembered the prosecutor gesturing toward the victims' families." State

Habeas Transcript, Volume II, at p. 428; State Habeas Transcript, Volume III, at p. 92.

**148.** "Counsel's failure to object to the comment may also have simply been a trial strategy to avoid drawing even more attention to the remark. Applicant has certainly not proven that it was not a trial strategy to forgo an objection to the comment." State Habeas Transcript, Volume II, at p. 428; State Habeas Transcript, Volume III, at p. 93.

**149.** State Habeas Transcript, Volume II, at p. 429; State Habeas Transcript, Volume III, at pp. 93–94.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.,* at 689, 104 S.Ct. 2052; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter,* —— U.S. ——, ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011)

Furthermore, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler,* 625 F.3d 229, 239 (5th Cir.2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. filed March 14, 2011* (*NO. 10–9511* ); *St. Aubin v. Quarterman,* 470 F.3d 1096, 1100 (5th Cir.2006) (holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 550 U.S. 921, 127 S.Ct.

2133, 167 L.Ed.2d 869 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir. 2006) (holding the same), *cert. denied,* 550 U.S. 920, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc* ) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

Petitioner also attacks the subjective rationales offered by petitioner's trial counsel during their testimony at petitioner's state habeas corpus hearing for their failure to object to the prosecutor's comment in question. However, the first prong of *Strickland* analysis focuses on the *objective* reasonableness of counsels' conduct, not their subjective state of mind. *Premo v. Moore,* —— U.S. ——, ——, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011); *Harrington v. Richter,* —— U.S. ——, ——, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); *Strickland v. Washington,* 466 U.S. at 688–89, 104 S.Ct. at 2064–65. Thus, the critical issue in the first prong of *Strickland* analysis is the objective reasonableness of trial counsels' conduct under the then-existing circumstances.

As explained above, petitioner's trial counsel paraded a large number of peti-

tioner's family members before the jury and had each of them make an emotional appeal for mercy, i.e., a specific request that the jury spare petitioner's life. The prosecution did not object to any of those emotional appeals even though it arguably could have done so under applicable Texas law. *See Sattiewhite v. State,* 786 S.W.2d 271, 290–91 (Tex.Crim.App.1989) (holding trial court correctly excluded testimony of capital defendant's proffered mental health expert regarding the appropriate punishment which should be imposed on the defendant), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990). Petitioner's trial counsel also repeatedly referenced those same emotional appeals for mercy by petitioner's family during closing argument at the punishment phase of petitioner's capital murder trial. Again, the prosecution did not object.

Petitioner's suggestion in his state habeas application that the prosecution could have called the victims' families to testify at the punishment phase of petitioner's trial about their own opinions as to the appropriate punishment for petitioner is legally specious. *See Simpson v. State,* 119 S.W.3d 262, 272 (Tex.Crim.App.2003) ("The wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible."), *cert. denied,* 542 U.S. 905, 124 S.Ct. 2837, 159 L.Ed.2d 270 (2004). "[W]e strongly discourage the State from soliciting or making any reference to the wishes of the victim's family or friends about the punishment to which the defendant should be sentenced." *Id.* Thus, the prosecution's comment on the wishes of the victims' families was properly subject to objection under Texas law.

Nonetheless, there clearly existed an objectively reasonable rationale for petitioner's trial counsel not to have leapt to their feet to object to the prosecutor's passing reference to the victims' families' wishes. Under the circumstances of petitioner's trial/ such an objection could rationally have been construed by the jury as undermining the integrity and legitimacy of petitioner's own family members' emotional appeals for mercy. Simply put, if petitioner's trial counsel had objected to the prosecutor's passing reference to the victims' families' wishes regarding punishment as an improper appeal to prejudice and sympathy, the jury could easily have construed such an objection as rendering petitioner's trial counsel highly hypocritical given the naked appeals for mercy riddled throughout the petitioner's punishment-phase evidence presentation and closing argument.

Nothing in the first prong of the *Strickland* standard requires trial counsel to object to each and every objectionable remark made by a prosecutor if there are objectively reasonable reasons to refrain from doing so. Given the petitioner's family members' strong emotional appeals for mercy made directly to the jury (without objection by the prosecution), this Court concludes objectively reasonable justifications existed for the decision by petitioner's trial counsel not to object to the prosecutor's passing reference to the wishes of the victims' families, even though that reference was clearly objectionable under applicable state law. Had petitioner's trial counsel made the objection petitioner now argues said counsel should have been made (regardless of how the state trial court ruled on such an objection), petitioner's trial counsel would have undoubtedly left the jury wondering why it was appropriate for the petitioner's family to make emotional appeals for mercy but inappropriate for the victims' families to express their desire for what they undoubtedly perceived to be a just sentence.

Criminal trial counsel who approach oral argument as a debate to be won by out-

maneuvering opposing counsel and objecting to every arguably improper statement made by opposing counsel ignore at their client's peril the possible negative impact of such a strategy on the jury's sensibilities. Having made a highly emotional appeal for mercy through petitioner's family members' naked appeals for the jury to spare petitioner's life, petitioner's trial counsel could have reasonably considered the objection petitioner now urges as more potentially disadvantageous to their efforts to obtain a life sentence for petitioner than simply ignoring the prosecutor's passing comment. Whether petitioner's trial counsel actually considered that possibility subjectively is irrelevant to this Court's analysis of the first prong of *Strickland* under the AEDPA.

So long as *objectively* reasonable justifications existed for the *conduct* of petitioner's trial counsel, the state habeas court's conclusion that this ineffective assistance claim fails to satisfy the deficient performance prong of *Strickland* is itself an objectively reasonable application of the *Strickland* test. *See Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in

making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

When viewed in proper context (i.e., after petitioner's trial counsel introduced considerable testimony from petitioner's family members consisting of emotional appeals for mercy), this Court finds it was objectively reasonable for petitioner's trial counsel to have refrained from objecting to the prosecutor's passing reference to the wishes of the victims' families regarding petitioner's sentence.

### b. *No Prejudice*

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.*, 466 U.S. at 693, 104 S.Ct. at 2067. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064. *Harrington v. Richter*, — U.S. —, —, 131 S.Ct. 770, 787–88, 178 L.Ed.2d 624 (2011).

 The evidence before the jury at the punishment phase of petitioner's capital murder trial established beyond any reasonable doubt that (1) petitioner participated in the abduction and robbery of Rosado, (2) petitioner stood guard while

Minjarez sexually assaulted Rosado, (3) petitioner was present at the motel with Minjarez when Rosado was killed, (4) petitioner directed Abdygapparova to purchase the shovel used to bury Rosado's body, (5) petitioner had previously been convicted pursuant to a guilty plea of burglary with intent to commit sexual assault in connection with an incident in which petitioner lured his victim's husband away from home, locked his victim's husband in petitioner's apartment, and then went back to sexually assault the victim, (6) petitioner participated in numerous burglaries, at least one of which resulted in petitioner serving a prison sentence and another of which involved petitioner leading police on a dangerous, high speed, chase, (7) deposited his semen inside the rectum of a twelve year old girl only hours before her lifeless body was found beside that of her equally battered thirteen-year-old cousin "dumped" in the high brush in an isolated location only days before Christmas, (8) the girls' bodies and Rosado's body revealed all three had been bound, severely beaten about the head and face, violently sexually assaulted, and asphyxiated in a manner suggesting they had been unable to offer much resistance as they were strangled to death, (9) petitioner had come very close to escaping from the BCADC only weeks before the start of his trial, and (10) *petitioner had never expressed any sincere remorse or contrition for his role in any of the three abductions, rapes, or murders.*

The trial record was not without some admittedly strong mitigating evidence, particularly the testimony showing the petitioner had experienced a clearly traumatic event when his father was shot and died in petitioner's arms when petitioner was but a teenager. Yet there was also evidence showing petitioner had engaged in several burglaries and other delinquent conduct (including heavy drug use) prior to

his father's tragic death and that petitioner had fathered several children out of wedlock with a variety of different women, beginning when petitioner was in his middle teenage years. In addition, petitioner's family members had made repeated emotional pleas to the jury for mercy on petitioner's behalf.

If petitioner's trial counsel had timely objected to the prosecutor's passing comment about the wishes of the victims' families, the most petitioner could reasonably have hoped for would have been an instruction directing the jury to disregard same. It is highly unlikely the Texas courts would have held the prosecutor's improper comment required a mistrial. *See Simpson v. State,* 119 S.W.3d at 271–73 (holding trial court properly denied motion for mistrial after a prosecution witness (who was also a family member of the victim) testified the victim's family unanimously wanted the defendant to receive the death penalty, in part, because the trial court had sustained an objection thereto and instructed the jury to disregard same).

> We also think that the jury would not place much weight on the erroneously elicited comment. Jurors understand that the victim's family members will be emotional and therefore less objective about what punishment should be given. It was probably no great surprise that the victim's family was in favor of the death penalty.

*Simpson v. State,* 119 S.W.3d at 274.

Under these circumstances, particularly considering the petitioner's emotional appeals to the jury for mercy made through his family members as contrasted with the petitioner's own failure to demonstrate any sincere remorse or contrition before his capital sentencing jury for any of the particularly brutal murders in which he par-

ticipated, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the prosecutor's passing comment about the wishes of the victims' families, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

### 4. *Conclusions*

Petitioner's complaint about his trial counsels' failure to object to the prosecutor's passing comment about the wishes of the victims' families does not satisfy either prong of *Strickland.*

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's ineffective assistance claim premised on the failure of petitioner's trial counsel to object to the prosecutor's comments in question was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

## V. *Ineffective Assistance by Appellate Counsel*

### A. *The Claim*

In his sixth and final claim for relief herein, petitioner argues his appellate counsel should have raised a point of error on direct appeal complaining about the state trial court's failure to admit Abdy-gapparova's written statement or hearsay testimony by detective Carian regarding its contents during the guilt-innocence phase of petitioner's capital murder trial.[150]

### B. *State Court Disposition*

#### 1. *Trial Court Proceedings*

To understand the full context of this ineffective assistance claim, it is necessary to return to the lengthy guilt-innocence phase trial testimony of detective Carian. After detective Carian testified on direct examination about the circumstances surrounding the petitioner's execution of his written statement of April 7, 2001 and Carian then read the petitioner's written statement before the jury, he testified about witnessing blood samples being drawn from both petitioner and Minjarez.[151] On cross-examination, petitioner's trial counsel emphasized that the factual assertions contained in petitioner's written statement coincided with the physical evidence detective Carian and other law enforcement officers recovered in the course of their investigation into Rosado's murder.[152] On redirect examination, detective Carian pointed out that, when he confronted petitioner with the contents of Abdy-gapparova's statement, petitioner had tried to shift blame for Rosado's murder toward Minjarez, and, at the time he interrogated petitioner, Carian was unaware that petitioner's DNA matched the rape kit of Priscilla Almares.[153] On re-cross, detective Carian admitted he had disclosed to petitioner practically the entire contents of Abdygapparova's written statement.[154]

---

**150.** Brief in Support of Petition, at pp. 36–43.

**151.** S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 28–68.

**152.** S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 69–94.

**153.** *Id.,* at pp. 94–105.

**154.** *Id.,* at pp. 105–09.

At that point, the attorneys requested a conference with the trial court outside the jury's presence. Once the jury left the courtroom, counsel for both parties engaged in a discussion in which the prosecutor argued the questions asked by petitioner's counsel had created a false impression that petitioner had been forthright and factually accurate in his interviews with detective Carian and that the prosecution believed it should be permitted to introduce testimony from detective Carian regarding false oral statements made to the detective by petitioner.[155] After a lunch recess, the discussions between counsel and the trial judge continued outside the jury's presence. During those discussions (1) petitioner's trial counsel objected to the admission of any testimony regarding oral statements made by petitioner on April 6, 2001, (2) the prosecutors argued they should be permitted to inquire into statements made by petitioner on April 6, 2001 in which petitioner denied any involvement in Rosado's murder because the questioning of detective Carian by petitioner's trial counsel had created the "false impression" that petitioner had fully cooperated with law enforcement officials from the start of their investigation into Rosado's murder, and (3) the state trial judge ruled she would permit the prosecution to question detective Carian about oral statements petitioner made on April 6, 2001.[156]

Detective Carian then testified (1) during their interview on April 6, 2001, petitioner initially denied knowing anything about Rosado's murder, claimed he was home on the night of her murder, and even denied knowing either Minjarez or Abdygapparova, (2) petitioner continued his denials even after Carian confronted petitioner with Abdygapparova's statement and Minjarez's photograph, and (3) petitioner ultimately claimed Minjarez raped and killed Rosado but denied raping her himself.[157] On re-cross examination, the following exchanges occurred:

Q. (BY MR. HANCOCK) Well, some of the stuff Asel told you exculpates him, doesn't it? I mean some of the stuff Asel tells you says that he didn't commit the murder, correct?

A. A lot of what Asel says is—

Q. No. Answer just my question. Okay.

A. Well, I can't answer the question as you put it because some of the information that I had that came from Asel was—did not do what you are suggesting.

Q. Well, didn't Asel say that—

MR. MCCLURE: Objection. Judge, that would be hearsay.

THE COURT: Sustained

Q. (BY MR. HANCOCK) I guess the point is you didn't tell him everything Asel told you, did you?

A. Just about. Yes.

Q. Okay. Well, some of the information that Asel told you would have been contrary to what you said about him participating in a rape and a murder of a female, correct?

A. No.

MR. MCCLURE: That would call for hearsay, Your Honor.

THE COURT: You may respond.

THE WITNESS: No. Because she wasn't there to be able to say one way or the other.

Q. (BY MR. HANCOCK) You told us she gave a statement. You told him

---

155. *Id.*, at pp. 110–15.

156. *Id.*, at pp. 116–27.

157. S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 137–32.

that you got the information that you are given is based upon the information that you got from Asel.

A. Yes. But during those particular times that you are referring to, she had been out collecting evidence. So she wouldn't have been able to be present to have witnessed the information that you are referring to regarding what happened in the room.

Q. Okay. Well, that's consistent in his, in Ramon Hernandez's statement, isn't it? Isn't it?

A. The consistency would be her not being present. Yes.

Q. Okay. And she gave her statement a whole day before; is that correct?

A. Not a whole day, just a few hours before because of the switch at midnight.

Q. You never told this man, in giving him information about this case when you told him in your response on direct examination was that he had been arrested for capital murder and that you had information that he participated in a kidnapping [sic], rape, and murder of a female, you never got information from Asel that he participated in a rape or a murder, did you?

A. Yes.

Q. From Asel?

A. Yes.

MR. MCCLURE: And I would object to further inquiry on this line because he's trying to open his own door to hearsay, Judge.

THE COURT: Sustained.

Q. (BY MR. HANCOCK) Detective, or Sergeant. I'm sorry. I want to ask you, and not hearsay, but I want to ask

you, did you take a statement from Asel the day before, on the 5th?

A. No. Detective Kellogg did.

Q. Someone did, okay?

A. Yes.

Q. As part of your lead duties in this case, Asel's statement was taken on the 5th, correct?

A. If I can just check. Yes, April the 5th.

Q. And did you reveal to him the entire contents of her statement? You didn't do that, did you?

MR. MCCLURE: Judge, I believe that question has been asked and answered three times.

MR. HANCOCK: Judge, it's cross examination. Please allow me some latitude on that.

THE COURT: And you may respond.

THE WITNESS: I revealed from her statement just about all the factual information that I had.

Q. (BY MR. HANCOCK) Okay. Nowhere in that statement does it say—

MR. MCCLURE: Judge, the question is going to ask for hearsay. May we approach the bench?

THE COURT: You may.[158]

During the ensuing conference held outside the presence of the jury and detective Carian, the following exchanges occurred:

THE COURT: Mr. Hancock, can you ask your question? You weren't allowed to finish the question, so what was the question?

MR. HANCOCK: I think I've forgotten my question, but what I—so I'll ask it again. Judge. I think this is where I was going with it.

This officer has clearly said that he had revealed all the information in

---

**158.** S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 135–38.

Asel's report to Ramon Hernandez before he gives his statement. And I think that I should be allowed to ask him did—so what you are saying is that did Asel tell you that, that she gave information in her statement that Ramon Hernandez did the killing in this case. And I will tell you, Judge, and I don't think anybody here will contradict it, that's not in her statement.

So you see, I find myself in the same position that Mr. McClure tried to find himself before lunch, and that's leaving a false impression with this jury. And that's why this line of questioning I objected to it. *Now we've opened the door to Asel's statement.* And I guess I can refresh his memory with it. But I think what we told you back in chambers is that Santos, when she comes back from running an errand, Santos says she's gone. So it leaves the impression that, with her that he had done the killing.

Now I find myself with this witness leaving the impression to the jury that he tells this man, and when he's giving him information about the case, that he says, well, Asel said you killed her. That is the impression that is being left. So now I need a cure to it, much like they got a cure to their false impression argument.

MR. MCCLURE: Well—

THE COURT: Mr. McClure.

MR. MCCLURE: First of all, the place that we now find ourselves is at the request of the defense. You will recall the Court's ruling, that it didn't matter whether or not I now went into the statements of Friday, April 6th. You ruled that you would allow the defense to introduce the oral statements that the Defendant made to Detective Kellogg on Saturday the 7th. And that being the request of the defense, I then went ahead in accordance with the

Court's ruling and the defense's request, to adduce the specific questions and answers from Detective Carian.

Now the defense seeks to kick open their own door to an accomplice's statement. That is not appropriate. That's far afield of the false impression that had been left with the jury previously. There is no false impression being left, when the fact is that Asel's statement says she doesn't know who did the killing; she wasn't present.

Furthermore, Detective Carian has left no false impression. He has repeatedly said that he believes that he told Ramon the factual evidence that he had. He has answered Mr. Hancock's question at least twice; that, no, based on Asel's statement, yes, he did have information that Ramon Hernandez was involved in all the constituent elements of the capital murder that he's charged with, individually and under the law of parties.

So there has been no false impression created. And Mr. Hancock would have the Court now believe that because he has kicked the door open, an accomplice's statement comes in. And furthermore, he predicates that upon what Asel's statement says Santos said. And you know where we are going next.

THE COURT: Yes.

MR. MCCLURE: I'm going to ask for Santos' statement to come in. And that says that Ramon Hernandez is the killer.

MR. HANCOCK: Judge, I just want to say my sentence, if I may.

THE COURT: All right.

MR. HANCOCK: Mr. McClure very specifically asked this sergeant that, did you tell Ramon Hernandez that you had information regarding his participation in the kidnapping [sic], rape, and murder of a female last Saturday. And then

he says that he got that information from Asel. He tells him that he got that information from his girlfriend.

What the jury now believes is that the information that he got says that Asel says that he kidnapped [sic], raped and murdered a female. And for them to be able to talk about this statement in its general purposes, hiding behind some hearsay objection and bootstrapping what the contents of the statement is to lead this jury to believe that that's what she said is incorrect. And I want to show you her statement, Your Honor, because it's more than what Mr. McClure just said.

Mr. Ugarte had underlined it. It says Santos opened the—well, the one, two, third paragraph. Your Honor. It's underlined.

THE COURT: Okay.

MR. MCCLURE: Judge, the point is that it doesn't matter what the words are in Asel's statement. The question of Detective Carian was that he had information that the Defendant participated. And Mr. Hancock wants to create the impression—

MR. HANCOCK: Wait a minute.

MR. MCCLURE:—that he personally did each of the constituent acts. And that is not the impression that has been left with this jury that has been educated on the law of parties.

MR. HANCOCK: But, Judge, he said he told this man everything that Asel said. And so everything that Asel said is that he didn't do the killing. And Mr. McClure is relying on that he gave him information that he participated in a killing.

THE COURT: Okay. The State's objection is sustained. Bring the jury back in.[159]

### 2. *State Habeas Proceeding*

Petitioner raised an ineffective assistance claim as his twelfth and final ground for state habeas relief in which he argued his trial counsel should have urged the trial court to admit testimony by detective Carian about the contents of Abdygapparova's written statement under the Texas Rule of Optional Completeness, i.e., Rule 107, Tex.R.Evid.[160] The state habeas trial court made findings of fact, conclusions of law, and recommended denial of this claim for relief on the merits.[161] The Texas Court of Criminal Appeals denied state habeas relief but specifically declined to adopt any of the state habeas trial court's findings or conclusions on this particular claim. *Ex parte Ramon Hernandez*, WR–69,724–01, 2008 WL 4151799 (Tex.Crim. App. September 10, 2008).

### C. *Constitutional Standard*

■ The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal, *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Blanton v. Quarterman*, 543 F.3d 230, 240 (5th Cir.2008) (the tradi-

---

**159.** S.F. Trial, Volume 23, at pp. 139–43.

**160.** State Habeas Transcript, Volume I, at pp. 81–86.

**161.** State Habeas Transcript, Volume II, at pp. 431–35; State Habeas Transcript, Volume III, at pp. 95–100.

tional *Strickland* standard applies to claims alleging ineffective assistance by appellate counsel), *cert. denied,* — U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Ries v. Quarterman,* 522 F.3d 517, 531 (5th Cir.) (*Strickland* analysis applies to claims of ineffective assistance by appellate counsel), *cert. denied,* — U.S. ——, 129 S.Ct. 485, 172 L.Ed.2d 351 (2008); *Henderson v. Quarterman,* 460 F.3d 654, 665 (5th Cir.2006) (*Strickland* furnishes the proper standard for review of a complaint of ineffective assistance by state appellate counsel), *cert. denied,* 549 U.S. 1252, 127 S.Ct. 1383, 167 L.Ed.2d 160 (2007); *Amador v. Quarterman,* 458 F.3d at 410–11 (holding complaints of ineffective assistance by state appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke,* 450 F.3d 158, 168 (5th Cir.2006) (applying the dual prongs of *Strickland* analysis to complaints of ineffective assistance by appellate counsel), *cert. denied,* 549 U.S. 1120, 127 S.Ct. 935, 166 L.Ed.2d 717 (2007); *Busby v. Dretke,* 359 F.3d 708, 714 (5th Cir.) (holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied,* 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins,* 528 U.S. at 285, 120 S.Ct. at 764; *Henderson v. Quarterman,* 460 F.3d at 665; *Busby v.*

*Dretke,* 359 F.3d at 714; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003).

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins,* 528 U.S. at 288, 120 S.Ct. at 765; *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman,* 460 F.3d at 665; *Busby v. Dretke,* 359 F.3d at 714; *Schaetzle v. Cockrell,* 343 F.3d at 445.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes,* 463 U.S. at 751–52, 103 S.Ct. at 3313.

■ Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke,* 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart,* 357 F.3d 521, 525 (5th Cir.2004) (holding the same); *Schaetzle v. Cockrell,* 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart,* 357 F.3d at 525; *Schaetzle v. Cockrell,* 343 F.3d at 445.

Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did

not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores–Ortega,* 528 U.S. 470, 477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins,* 528 U.S. at 287–89, 120 S.Ct. at 765–66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland* ); *Busby v. Dretke,* 359 F.3d at 714–17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

### D. *Synthesis*

#### 1. *No Deficient Performance*

■ During the evidentiary hearing in petitioner's state habeas corpus proceeding, petitioner's state appellate counsel testified in pertinent part that he did not raise a point of error challenging the state trial court's refusal to admit, under the rule of optional completeness or Rule 107, Tex.R.Evid., detective Carian's testimony regarding the contents of Abdygapparova's written statement because (1) he did not believe such an argument had been properly preserved by trial counsel, i.e., no specific objection or argument urging such a legal position had been intelligently communicated to the trial court, and (2) he did not believe such a point of error could have

proven successful because of the harmless error rule.[162]

This Court has independently reviewed the petitioner's trial record, the record from petitioner's state direct appeal and state habeas corpus proceedings, and the legal authorities cited by petitioner in support of this claim of ineffective assistance. This Court has also independently reviewed applicable state case law and rules. This Court concludes both of petitioner's state appellate counsel's proffered justifications for not including a point of error premised on the Texas "Rule of Optional Completeness," i.e., Rule 107 of the Texas Rules of Evidence, urged herein by petitioner are objectively reasonable.

##### a. *Point of Error Arguably Not Properly Preserved*

Under Rule 103 of the Texas Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if specific ground was not apparent from the context." *Resendez v. State,* 306 S.W.3d 308, 312 (Tex.Crim.App.2009); *Mays v. State,* 285 S.W.3d 884, 889 (Tex.Crim.App.2009) (to preserve error regarding a trial court's exclusion of evidence, the complaining party must make an "offer of proof" which sets forth the substance of the proffered evidence).

The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint. Although there are no

---

**162.** S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rocky Glass, at pp. 204–06, 208. As attorney Glass correctly pointed out, petitioner's own trial counsel "opened the door" to the admission of petitioner's April 6, 2001 oral statements to detective Carian by interrogating detective Carian regarding petitioner's and detective Carian's oral conversations on April 6–7, 2001. *Id.*

technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." The parties, not the judge, are responsible for the correct application of evidentiary rules; in order to preserve a complaint for appeal, the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention.

*Resendez v. State,* 306 S.W.3d at 312–13 (*footnotes omitted* ).

In addition, under Rule 33.1 of the Texas Rules of Appellate Procedure,[163] the Texas Court of Criminal Appeals usually requires great specificity in objections to preserve a point of error for review on direct appeal. *See, e.g., Freeman v. State,* 340 S.W.3d 717, 730–31, 2011 WL 891266 *11 (Tex.Crim.App. March 16, 2011) (holding request for instructed verdict did not preserve facial and "as applied" constitutional challenges to Texas capital murder statute's provision addressing murder of a peace officer "acting in the lawful discharge of an official duty"); *Estrada v. State,* 313 S.W.3d 274, 303 (Tex.Crim.App. 2010) (failure to timely object or move for mistrial forfeit defendant's right to complain about allegedly improper jury argument), *cert. denied,* — U.S. —, 131 S.Ct. 905, 178 L.Ed.2d 760 (2011); *Mays v. State,* 318 S.W.3d 368, 388 (Tex.Crim.App. 2010) (holding neither motion for directed

verdict based on insufficient evidence nor objection to lack of definition of "acting in the lawful discharge of an official duty" in jury charge preserved for appellate review complaint of unconstitutional vagueness in Texas capital murder statute's provision), *cert. denied,* — U.S. —, 131 S.Ct. 1606, 179 L.Ed.2d 506 (2011); *Lovill v. State,* 319 S.W.3d 687, 691 (Tex.Crim.App.2009) ("The complaining party must have informed the trial judge what was wanted and why the party was entitled to it."); *Wright v. State,* 28 S.W.3d 526, 536 (Tex. Crim.App.2000) (holding stated objections to the admission of testimony based on hearsay and Rule 107 grounds did not preserve a Sixth Amendment Confrontation Clause objection to the same evidence), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001)

This Court concludes nothing in the exchanges between petitioner's trial counsel and the state trial court detailed above reasonably alerted the state trial court that petitioner was suggesting detective Carian should be permitted to testify to the clearly hearsay within hearsay details of Abdygapparova's written statement based upon the Texas Rule of Optional Completeness found in Rule 107, Tex. R.Evid. Petitioner's trial counsel did not identify any evidence introduced by the prosecution relating to the *contents* of Abdygapparova's written statement. The rather vague references by petitioner's trial counsel to "opening the door" did not alert the state trial court that petitioner was relying upon the Rule of Optional Completeness as a legal basis for admitting detective Carian's testimony concern-

---

**163.** Rule 33.1(a), Texas Rules of Appellate Procedure, provides that, as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request or motion that stated the grounds for the ruling

that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.

ing the contents of Abdygapparova's written statement. "'Opening the door' or 'inviting' testimony that would otherwise pertain to an inadmissible subject matter does not mean that such testimony is necessarily 'invited' into evidence in *any* form, including hearsay." *Kipp v. State,* 876 S.W.2d 330, 337 (Tex.Crim.App.1994). Petitioner's state appellate counsel's conclusion that an "optional completeness" argument had not been properly preserved for state appellate review was, therefore, an objectively reasonable deduction from the relevant portions of the state trial record.

### b. *No Reversible Error Under Texas Law*

Rule 44.2 of the Texas Rules of Appellate Procedure provides in pertinent part as follows:

(a) *Constitutional Error.* If the appellate record . in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

(b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

"In that harmless error context, a reviewing court must determine whether the error had a substantial influence on the proceeding itself or whether it had a substantial and injurious effect or influence on the jury's verdict." *Gonzalez v. State,* 117 S.W.3d 831, 840 (Tex.Crim.App.2003). "Under Rule of Appellate Procedure 44.2(b), we disregard all non-constitutional errors that do not affect the appellant's

substantial rights. A substantial right is affected 'when the error has a substantial and injurious effect or influence in determining the jury's verdict.'" *Rich v. State,* 160 S.W.3d 575, 577 (Tex.Crim.App. 2005).

Petitioner's state appellate counsel's conclusion that a point of error premised upon the Texas Rule of Optional Completeness would not withstand scrutiny under the Texas harmless error rule was likewise objectively reasonable. Far from exonerating petitioner, as petitioner's trial counsel implicitly suggested during his questioning of detective Carian, Abdygapparova's written statement indicated petitioner (1) was an active participant in Rosado's abduction and robbery, driving Abdygapparova's vehicle while Minjarez grabbed Rosado and dragged her into the vehicle, (2) drove Rosado and the others to a motel, where Minjarez repeatedly raped Rosado, (3) directed Abdygapparova to go purchase the shovel used to bury Rosado's body at a time when Rosado was still alive, (4) refused Abdygapparova's request that he accompany her to buy the shovel, (5) was present at the motel when Rosado was killed, (6) carried Rosado's lifeless body from the motel room to Abdygapparova's vehicle, (7) helped Minjarez bury Rosado's body, (8) helped Minjarez burn various items taken from Rosado's purse, (9) directed Abdygapparova to throw Rosado's clothing out the window of her vehicle as petitioner drove around town, and (10) directed Abdygapparova to sell her vehicle.[164]

Petitioner's own written statement corroborated Abdygapparova's narrative and added additional details such the facts he (1) sped away from the scene of Rosado's

---

**164.** Statement of Asel Abdygapparova, State Habeas Transcript, Volume I, at pp. 299–303.

A substantial portion of Abdygapparova's written statement is quoted verbatim in note 9, *supra.*

abduction, (2) drove them to his own residence where he directed Minjarez to cover Rosado's head, (3) directed Abdygapparova to obtain tape from inside his home to secure Rosado's hands, head covering, and mouth, (4) stood watch at the motel while Minjarez and Abdygapparova forced Rosado to reveal her PIN, (5) directed Abdygapparova not to leave fingerprints at the motel, (6) helped Minjarez secure Rosado's hands behind her back after Minjarez had sexually assaulted Rosado multiple times, (7) walked outside and looked around while Minjarez fatally forced Rosado's face down on to a pillow with his hands on the back of her neck, (8) watched Minjarez wash Rosado's body externally and internally, (9) directed Abdygapparova to drive all of them with Rosado's body to his residence, (10) stood watch while Minjarez buried Rosado's body, (11) disposed of Rosado's jewelry and clothing by tossing them from Abdygapparova's vehicle as they drove, (12) burned several items taken from Rosado's purse at petitioner's residence, (13) helped Abdygapparova clean her vehicle's interior, and (14) went with Abdygapparova to Austin to sell her vehicle.[165]

During his cross-examination of detective Carian, petitioner's trial counsel attempted to suggest that Abdygapparova's written statement somehow established petitioner had neither personally sexually assaulted nor personally murdered Rosado. Detective Carian resisted these efforts, arguing that Abdygapparova claimed she was not present at the motel at the time she suggested Rosado was murdered.[166] This Court finds Abdygapparova's written statement actually established that (1) she was not present for at least two substantial periods of time during which petitioner and Minjarez were at the motel with Rosado and (2) she was not present during the time frame in which she claimed Rosado was murdered. In petitioner's own written statement, he recites that, at one point, he declined Minjarez's invitation to sexually assault Rosado *because* Abdygapparova was present. When read together, at a minimum, the written statements of petitioner and Abdygapparova establish the petitioner clearly facilitated Minjarez's multiple sexual assaults upon Rosado and Minjarez's murder of Rosado. Furthermore, while Abdygapparova's statement does include a recitation of a hearsay exchange between her and Minjarez regarding the death of Rosado, it is impossible to tell from that cryptic exchange (when Abdygapparova returned from purchasing the shovel later used to bury Rosado's body and asked Minjarez "Did you kill her?") whether she was asking Minjarez if he had personally killed Rosado or if Minjarez and petitioner had together killed Rosado.[167]

Petitioner's jury was properly instructed at the guilt-innocence phase of trial on the Texas law of parties.[168] Under the Texas law of parties, i.e., the provisions of the Texas Penal Code that address the criminal liability of accomplices and co-conspirators, a criminal defendant may be held responsible for criminal acts of another person as follows:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

(1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible per-

---

**165.** State's Exhibit 5, S.F. Trial, Volume 29.

**166.** *See note 158, supra, and accompanying text.*

**167.** *See note 9, supra,* for the complete text of that exchange, which also appears at State Habeas Transcript, Volume I, at p. 301.

**168.** Trial Transcript, at pp. 245–46.

son to engage in conduct prohibited by the definition of the offense;

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Section 7.02, Texas Penal Code Annotated (Vernon 2003).*

Given the foregoing, this Court concludes petitioner's state appellate counsel's conclusion that an "optional completeness" point of error regarding the contents of Abdygapparova's written statement would have had difficulty surmounting the Texas harmless error rule, was an objectively reasonable conclusion. Petitioner's state appellate counsel could have reasonably concluded that a successful challenge to the state trial court's exclusion of detective Carian's testimony concerning the contents of Abdygapparova's written statement would have raised harmless error, at best. Petitioner's state appellate counsel could have reasonably concluded the Texas Court of Criminal Appeals would likely determine the non-admission of Abdygapparova's statement (or Carian's recitation of the contents of same) did not have a substantial or injurious effect on the jury's verdict at the guilt-innocence phase of petitioner's trial.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray,* 477 U.S. at 536, 106 S.Ct. at 2667; *Jones v. Barnes,* 463 U.S. at 751–52, 103 S.Ct. at 3313. That is precisely what petitioner's state appellate counsel did when he chose not to pursue the point of error premised on the "Rule of Optional Completeness" now urged by petitioner herein. *See Broxton v. Cockrell,* 278 F.3d 456, 458 (5th Cir.) (holding failure to raise a meritless point of error did not cause performance of appellate counsel to fall below an objective level of reasonableness), *cert. denied,* 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002).

### 2. *No Prejudice*

This Court independently concludes that the "Rule of Optional Completeness" point of error urged by petitioner as the underlying basis for his sixth and final claim herein would not have been of dubious utility; it would have been doomed to failure under applicable Texas law and the facts of petitioner's case.

The Texas Rule of Optional Completeness is contained in Rule 107, Texas Rules of Evidence, and states as follows:

When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation, writing or recorded statement is given in evidence, any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same

may also be given in evidence. "Writing or recorded statement" includes depositions.

*Wright v. State,* 28 S.W.3d 526, 536 n. 10 (Tex.Crim.App.2000), *cert. denied,* 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001).

The plain language of this rule provides that, when part of a conversation is placed in evidence by one party, the other party can put the remainder of the conversation (or writing) into evidence to explain the prior comments or otherwise make them fully understood. *Wright v. State,* 28 S.W.3d at 536. The fundamental problem with petitioner's complaint about the state trial court's exclusion of Carian's testimony regarding the contents of Abdygapparova's written statement is that the prosecution made no effort whatsoever to introduce any of the contents of Abdygapparova's written statement. This Court's independent review of the entire record from petitioner's trial reveals not even a single instance in which the prosecution questioned detective Carian or any other witness about the contents of Abdygapparova's written statement. On the contrary, all such questions were directed to detective Carian by petitioner's own trial counsel. Thus, under the plain language of Rule 107, the Texas Rule of Optional Completeness had no application to detective Carian's testimony regarding the contents of Abdygapparova's written

statement. *See Washington v. State,* 856 S.W.2d 184, 186 (Tex.Crim.App.1993) (the Rule of Optional Completeness is not implicated until such time as a party attempts to have a portion of an act, declaration, conversation, writing or recorded statement "given in evidence," at which time the adverse party is entitled to introduce into evidence the remaining parts of the act, declaration, conversation, writing or recorded statement necessary to a full understanding of the evidence).

██ Furthermore, as was explained above, contrary to the suggestions implicit in the questions petitioner's trial counsel asked detective Carian, Abdygapparova's written statement does not purport to establish that the petitioner did not kill Rosado. On the contrary, she merely stated that she asked Minjarez if "you killed her" and Minjarez responded "Yes. She's dead." [169] it is impossible to tell from the cryptic exchange recited in Abdygapparova's statement whether she was referring to only Minjarez or to both Minjarez and petitioner when she asked "did you kill her?" In any event, Abdygapparova claimed she was not present when Rosado was killed. Thus, she could not offer any personal knowledge regarding who actually killed Rosado. Any effort to get Carian to testify regarding what Abdygapparova's written statement said about statements Minjarez made would have involved solicitation of hearsay within hearsay that was

---

**169.** In her written statement, Abdygapparova made the following statements:

> After I bought the shovel I went back to the motel room. I parked the car and knocked. Santos opened the door. He wouldn't let me in, but walked me back to the car. He was telling me not to go in there. I asked him why, what did they do in there. He said she is gone. I said what do you mean, you killed her? He said "yes, she is gone." He told me to wait outside. I was waiting by the car. Santos came back out and called me to the room, I went

> into the room and saw her laying down on the floor. She didn't have a towel on her head anymore and she had no clothes on. That is when I saw her body. She was dead. She wasn't moving, and she didn't have the towel on her head or the tape on her wrists. Her eyes were closed, and there was some blood on the right side of her face. I couldn't tell where it was coming from. They told me they have to bury her.

State Habeas Transcript, Volume I, at p. 301.

clearly outside the scope of Rule 107, *Tex. R.Evid.*

Under Texas law, an erroneous ruling excluding evidence may rise to the level of a constitutional violation if it effectively prevents the defendant from presenting his defensive theory. *Walters v. State,* 247 S.W.3d 204, 221 (Tex.Crim.App.2007). The state trial court's ruling excluding hearsay testimony from detective Carian concerning the specific hearsay within hearsay contents of Abdygapparova's written statement did not prevent petitioner from presenting any defensive theory.

Under the harmless error standard of review applicable in Texas, quoted above in full from Rule 44.2, *Tex.R.App.P.,* the key question is whether non-constitutional errors such as the exclusion of detective Carian's testimony regarding the contents of Abdygapparova's written statement's contents affected petitioner's substantial rights, i.e., did the error have a substantial and injurious effect or influence in determining the jury's verdict. *Rich v. State,* 160 S.W.3d 575, 577 (Tex.Crim.App.2005). For the reasons set forth at length above, this Court independently concludes petitioner's substantial rights were not detrimentally impacted by virtue of the state trial court's exclusion of detective Carian's testimony regarding the contents of Abdygapparova's written statement. Simply put, Abdygapparova's written statement did not exonerate petitioner or even claim to be based on any personal knowledge regarding who actually murdered Rosado.

This Court independently concludes there is no reasonable probability that, but for the failure of petitioner's state appellate counsel to raise the "optional completeness" point of error petitioner urges herein, the outcome of petitioner's direct appeal would have been any different. The failure of petitioner's state appellate counsel to raise what would have been a meritless point of error did not "prejudice" petitioner within the meaning of *Strickland. See Medellin v. Dretke,* 371 F.3d 270, 279 (5th Cir.2004) (failure to raise a meritless claim on direct appeal did not amount to ineffective assistance), *cert. dism'd,* 544 U.S. 660, 125 S.Ct. 2088, 161 L.Ed.2d 982 (2005); *Garcia v. Quarterman,* 454 F.3d 441, 450 (5th Cir.2006) (when there was no prejudice from a trial error, by extension there is no prejudice from an appellate error predicated on the same issue).

### E. *Conclusions*

Petitioner's complaint about the performance of his state appellate counsel fails to satisfy either prong of *Strickland* analysis.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's complaint about the failure of his state appellate counsel to raise a point of error premised on the Texas Rule of Optional Completeness was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

### VI. *Certificate of Appealability*

#### A. *The Necessity for Obtaining a CoA*

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997) (recognizing the "substantial showing" requirement for a CoA

under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir.1997) (holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

■ Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell*, 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n. 10 (5th Cir.2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir.1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n. 10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

B. *The Standard for Obtaining a CoA*

■ A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here

a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, —— U.S. ——, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir.2008); *Foster v. Quarterman*, 466 F.3d 359, 364 (5th Cir.2006); *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir.2005); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir.2005), *cert. denied*, 548 U.S. 909, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller–El v. Cockrell*, 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364–69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

## C. Synthesis

■ The state habeas court's factual findings regarding the voluntariness of petitioner's written confession and petitioner's waiver of his Fifth and Sixth Amendment rights are eminently reasonable in light of that same court's objectively reasonable credibility findings. Reasonable jurists could not dispute the objectively reasonable decision by the state habeas court to credit the testimony of all of the individuals at the BCADC and the two investigating detectives regarding petitioner's demeanor on April 6–7, 2001. The undisputed facts that petitioner's vital signs were within or near the normal range on the morning of April 7, 2001 and the petitioner never told either of his experienced trial counsel about his alleged Klonopin withdrawal symptoms furnished the state habeas court with compelling reasons to reject as incredible petitioner's account of the events of April 6–7, 2001.

Petitioner was given an opportunity to present the state habeas court with all of the additional evidence concerning petitioner's motion to suppress that petitioner argued should have been presented during petitioner's pretrial motion to suppress hearing and still petitioner's complaints about the alleged involuntariness of his written confession and waiver of his Fifth and Sixth Amendment rights failed to persuade the same state trial judge who presided over his original motion-to-suppress hearing. Petitioner's argument regarding

his trial counsel's failure to exclude evidence of petitioner's involvement in the murder of Priscilla Almares was premised upon a misunderstanding of applicable procedural law, which simply does not permit the type of evidence-based pretrial challenge to a state indictment petitioner argued should have been made on his behalf. Given the highly emotional appeal for mercy orchestrated by petitioner's trial counsel, through the naked appeals for mercy made by petitioner's friends and family, the prosecution's passing reference to the desires of the victims' families did not prejudice petitioner within the meaning of *Strickland.* Petitioner's state appellate counsel had multiple, reasonable, reasons to believe that a point of error regarding Abdygapparova's written statement premised on the Rule of Optional Completeness would likely be unable to overcome the Texas harmless error rule.

This Court has independently reviewed the entirety of petitioner's trial, direct appeal, and state habeas record and independently concludes petitioner's remaining claims for relief all fail to satisfy either prong of the *Strickland* test. Even if it were possible to quibble over this Court's analysis of the deficient performance prong of *Strickland* with regard to some of petitioner's ineffective assistance claims herein, there is no basis for disagreement among reasonable jurists with this Court's conclusions regarding the lack of prejudice supporting any of petitioner's ineffective assistance claims. Simply put, reasonable jurists could not disagree with this Court's conclusion that all of petitioner's ineffective assistance claims herein fail to satisfy the prejudice prong of *Strickland.* There was overwhelming evidence supporting the jury's verdict at both phases of petitioner's capital murder trial. Furthermore, under the highly deferential standard applicable to state court rejections on the merits of ineffective assistance claims under the AEDPA, petitioner is not entitled to a CoA on any of his ineffective assistance claims herein:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Knowles v. Mirzayance,* 556 U.S., at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter,* —— U.S. at ——, 131 S.Ct. at 788.

Petitioner is not entitled to a CoA on any legal issue, procedural or substantive, in this cause.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's Petition, as supplemented by petitioner's Brief in Support of Petition, *docket entry nos. 11 and 12,* filed May 15, 2009, as further supplemented by Petitioner's Reply to Respondent's Answer, *docket entry no. 28,* filed December 3, 2009, is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability.

3. Any other pending motions are **DISMISSED** as moot.

4. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.